**Kenneth Wayne O'GUINN, Petitioner–Appellee, Cross–Appellant,**

v.

**Michael DUTTON, Respondent–Appellant, Cross–Appellee.**

Nos. 93–5578, 93–5620.

United States Court of Appeals, Sixth Circuit.

Reargued June 14, 1995.

Decided July 3, 1996.

**1410**

Paul R. Bottei, Christopher M. Minton (briefed), Lassiter, Tidwell & Hildebrand, Michael J. Passino (argued), Passino & Minton, Nashville, TN, for Petitioner–Appellee, Cross–Appellant.

Kathy Morante, Asst. Atty. Gen. (argued and briefed), Charles W. Burson, Atty. Gen., Glenn R. Pruden, Office of the Atty. Gen., Criminal Justice Div., Nashville, TN, for Respondent–Appellant, Cross–Appellee.

Before: MERRITT, Chief Judge; KENNEDY, MARTIN, JONES, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, and MOORE, Circuit Judges.

The court delivered a PER CURIAM opinion, in which MERRITT, C. J., MARTIN, JONES, MILBURN, NELSON, RYAN, and MOORE, JJ., joined. MERRITT, C.J. (pp. 1413–1430), delivered a separate concurring opinion, in which JONES, J., joined. BOGGS, J. (pp. 1430–1432), delivered a separate dissenting opinion, in which SILER and BATCHELDER, JJ., joined, with BATCHELDER, J. (pp. 1432–1464), also delivering a separate dissenting opinion, in which KENNEDY, BOGGS, NORRIS, SUHRHEINRICH, and SILER, JJ., joined.

PER CURIAM.

Kenneth Wayne O'Guinn was convicted in state court in Jackson, Tennessee, of first degree murder and aggravated rape against Sheila Cupples. He is currently serving a life sentence for the aggravated rape and is under a death sentence for the murder. The District Court granted O'Guinn's petition for a writ of federal habeas corpus on the grounds that his confession was obtained in violation of his right against self-incrimination and because he received ineffective assistance of counsel during sentencing. Warden Dutton appealed the issuance of the writ. In a split decision, the original panel that heard the case reversed the issuance of the writ and the *en banc* court agreed to rehear the appeal. *O'Guinn v. Dutton,* 42 F.3d 331 (1994), *vacated,* 42 F.3d 359 (6th Cir.1995). The *en banc* court finds that the federal habeas petition is a "mixed" petition—that is, one containing exhausted and unexhausted claims. This Court also finds that principles of comity and federalism require that unexhausted claims be decided in the first in-

stance by the state courts in the absence of exceptional or unusual circumstances. Because the Court finds no such exceptional or unusual circumstances here, the petition is dismissed so that the state courts may adjudicate the claims presented.

## I.

Sheila Marie Cupples was brutally raped and murdered on the night of May 23, 1981 after spending the evening at the Hat & Cane, a bar in Jackson, Tennessee. Sheila, her cousin Joannie Cupples and two friends spent the evening drinking, taking Darvon and dancing at the Hat & Cane. Sheila apparently became quite intoxicated. Sheila's cousin Joannie testified that she last saw Sheila around midnight near the entrance to the Hat & Cane. Sheila's body was found the next afternoon in a field with her halter top wrapped around her neck and strangulation was listed as the cause of death. The local police and the Tennessee Bureau of Investigation interviewed numerous people in the weeks and months following the murder but made no arrests. O'Guinn was not a suspect during the investigation.

Two years later, on July 4, 1983, O'Guinn was arrested in Alabama for the assault and rape of an Alabama woman. O'Guinn admitted the assault but denied the rape. O'Guinn was unable to post bond and remained in prison. About a week later, the Alabama authorities began to question O'Guinn about an unsolved Alabama murder. Because O'Guinn was originally from Jackson, Tennessee, the Alabama authorities contacted the Jackson police to do a background check on O'Guinn. The Tennessee authorities decided to question O'Guinn about the unsolved Cupples murder. Over the next several weeks, a detective from the local police force in Jackson, Tennessee and an agent from the Tennessee Bureau of Investigation traveled to Alabama several times to interview O'Guinn.

On August 12, 1983, O'Guinn confessed to both the Alabama murder and the murder of Sheila Cupples. The confession in the Cup-

ples murder was admitted at trial.[1] A jury convicted O'Guinn of aggravated rape and first-degree murder. He was sentenced to life imprisonment for the aggravated rape and to death for the murder.

The conviction and sentence were affirmed by the Tennessee Supreme Court on direct appeal. *State v. O'Guinn*, 709 S.W.2d 561 (Tenn.), *cert. denied*, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986). In 1987, O'Guinn filed a petition with the Tennessee state courts for post-conviction relief. The petition was dismissed by the circuit court and the Tennessee Court of Criminal Appeals affirmed. *State v. O'Guinn*, 786 S.W.2d 243 (Tenn.Crim.App.1989). The Tennessee Supreme Court denied O'Guinn permission to appeal. In 1989, O'Guinn filed a second post-conviction petition with the state courts; it was also dismissed.

O'Guinn filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in October 1990 and a superseding petition in August 1992. It is undisputed that O'Guinn had requested all exculpatory documents from the State before his trial in state court. Upon utilizing the discovery procedures under the federal habeas statute, O'Guinn learned for the first time that arguably material documents had not been turned over to O'Guinn's counsel before trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). O'Guinn amended his federal petition and raised for the first time his claim that the State of Tennessee had improperly withheld numerous documents from his counsel before trial. This claim, therefore, has not been addressed in any manner by the Tennessee state courts.

The District Court held an evidentiary hearing and granted the writ of habeas corpus on the grounds that O'Guinn's confessions were obtained in violation of his right against self-incrimination and that his right to effective assistance of counsel was violated during the sentencing phase of his trial. *O'Guinn v. Dutton*, 870 F.Supp. 779 (M.D.Tenn.1993). The District Court ad-

---

**1.** O'Guinn's confessions in the Alabama murder were suppressed by the Alabama courts because it was found that O'Guinn's waiver of his right to

counsel was not knowing and intelligent. *State v. O'Guinn*, 462 So.2d 1052 (Ala.Cr.App.1985).

dressed only one small part of O'Guinn's *Brady* claim and, without discussion, found the claim to be without merit. *Id.* at 786. It did not address the other main points of the *Brady* claim.

In 1995, O'Guinn filed his third post-conviction petition with the Tennessee state courts alleging that his constitutional rights were violated by the withholding of documents in violation of *Brady*. The state courts are holding the petition in abeyance pending the outcome of the case in the federal courts.

## II.

The habeas statute, 28 U.S.C. § 2254(b), provides that the application for a writ will not be granted

> unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

The Supreme Court has held that a habeas petition containing both exhausted and unexhausted claims must be dismissed in its entirety. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). It is undisputed that the habeas petition here is a "mixed" one, because it contains both exhausted and unexhausted claims. As such, we find that it should be returned to state court for adjudication of the claims presented.

■ The requirement for exhaustion of remedies is not jurisdictional because state courts are fully empowered to adjudicate federal rights in the first instance; it is essentially a matter of federalism and comity. *Granberry v. Greer*, 481 U.S. 129, 133–34, 107 S.Ct. 1671, 1674–75, 95 L.Ed.2d 119 (1987); *Duckworth v. Serrano*, 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (state court should be afforded first opportunity to correct constitutional violation). Unless there is no available state process, or circumstances exist that render the process ineffective to protect petitioner's rights (circumstances not present in this case), a state can adjudicate a federally-based claim such as O'Guinn's claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Granberry*, 481 U.S. at 133–34, 107 S.Ct. at 1674–75.

In 1987, the Supreme Court held in *Granberry v. Greer* that federal courts could entertain unexhausted claims under certain circumstances, but the Court circumscribed this exception to *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973) quite narrowly. *Id.* In *Granberry*, the state inadvertently failed to raise the defense of non-exhaustion at the district court level, but raised it at the appeals court. The Supreme Court held that federal courts are to determine on a case-by-case basis whether comity and federalism would be better served by requiring further state proceedings or addressing the merits immediately. *Id.* at 134, 107 S.Ct. at 1675. The Supreme Court again confirmed that "there is a strong presumption in favor of requiring the prisoner to pursue his available state remedies." *Id.* at 131, 107 S.Ct. at 1674. In particular, the Court said, if the case involves an important unresolved question of fact or state law or where there is an important state interest at stake, a return to the state courts is appropriate. *Id.* at 134–35, 107 S.Ct. at 1675–76. Unless "unusual" or "exceptional" circumstances make it appropriate to reach the merits of an unexhausted issue, the Court held that the petition should be dismissed so that the unexhausted claim may be reviewed by the state courts in the first instance. *Id.* at 134, 107 S.Ct. at 1675. Thus, the exception in *Granberry* is fairly narrow and the Supreme Court has been quite clear that exhaustion is the preferred avenue and that exceptions are to be for narrow purposes only.

■ In this case, the state courts have an important interest in reviewing a serious, unexhausted constitutional claim. O'Guinn's *Brady* claim involves the conduct of a state prosecutor (in particular, his decisions regarding the withholding of evidence) in a state trial in which the defendant was prosecuted for violating state law. Even if there were not a presumption in favor of returning mixed petitions to state court, this would be an appropriate case in which to do so. The

interests of justice and comity do not weigh in favor of having this Court decide the question. Extending *Granberry* beyond the "exceptional" or "unusual" case undermines the law's clear preference for having unexhausted claims decided in state court. Because this case presents no exceptional or unusual circumstances, it should be addressed by the state courts in the first instance.

■ We note that the District Court held an evidentiary hearing on some of the issues raised in O'Guinn's habeas petition. The holding of a hearing is neither "exceptional" nor "unusual" and therefore does not provide grounds for this Court to decide unexhausted claims. Moreover, in this case it was not a full hearing and the question of exhaustion was never discussed by the District Court. *See* 870 F.Supp. 779.

O'Guinn has filed a petition in state court seeking adjudication by the state court on the *Brady* issue. The state court is holding the petition in abeyance pending the outcome of the federal proceeding. While a ruling by our Court on this issue would not be binding on the state courts, we believe that the proper course is to dismiss the entire petition and allow the state courts the first opportunity to adjudicate the claims presented. There is no reason to believe that the state courts will not address O'Guinn's claims adequately or that it would be futile to pursue these matters in state court. We should not deny the state courts the opportunity to decide the *Brady* claim. Accordingly, the petition is dismissed without prejudice for adjudication by the state courts in the first instance.

MERRITT, Chief Judge, concurring.

I concur in the Court's per curiam opinion on the requirement to exhaust state judicial remedies. Our judgment in effect remands the case to the state courts for further examination of the issues.[1] I have now heard this case twice, once when it was argued before the panel and again when it was argued *en banc*, and I have studied it closely. In my view, after all is said and done in the state and federal courts, there must be a new trial. Because this case is complex, and the interplay of the factual and constitutional issues difficult to grasp immediately, I write separately to record for future reference if the

---

**1.** Judge Boggs' dissenting opinion, finding "extreme oddity" in our disposition of this case, is itself an unusual judicial opinion. First, it fails to recognize that alternative arguments by litigants are the norm in cases in our legal system, including death penalty cases, and should not be rejected simply because different remedies are called for. There is no election of remedies requirement in habeas corpus cases and no policy disfavoring simultaneous arguments based on exhaustion and on the merits.

Second, Judge Boggs' opinion fails even to mention or take notice of the point that counsel for O'Guinn only found out about the *Brady* issue as a result of discovery conducted in the District Court after the proceedings in state court were completed. To fault O'Guinn's counsel for failing to raise "on at least three prior occasions" facts in the state court that the state district attorney failed to turn over to O'Guinn for many years is disingenuous, to say the least. How was counsel supposed to raise unknown facts in state court?

It is not the function of the federal courts to kowtow to the political passions of the day that decree that we supply only a swift execution without regard to whether the accused is guilty or received a fair trial. In the judicial arena, there is no traditional social value or constitutional principle requiring rapid execution or extinction of human life. To refer to O'Guinn's legitimate exercise of his constitutional and statutory rights as an exercise in game theory—as "try[ing] his luck in federal court" (a phrase removed from the galley proofs after this opinion was written) and "[drawing] another arrow from [his] quiver"—makes light of both O'Guinn's life and the efforts of his counsel.

It is our job to make sure that the traditional principles of federalism are honored. It is our job to see that a life is not taken in the absence of a fair trial in which the constitutional rights granted to the accused are observed or to allow an execution while there remains a serious unanswered question about whether the accused is in fact guilty of the crime charged. The process of deliberation, reflection, trial, review and the elimination of error and uncertainty takes time, including the time it takes to review new evidence when it becomes necessary. The traditional deliberative process must be fully complied with in order to insure that innocent life and the attributes of human dignity are preserved in the face of the biological passion and hostility in our species that lead us to kill each other without reason. If this traditional process of deliberation and reflection takes time, we must take the time. In light of the fallibility of human judgment, it is better that even the life of a guilty man be spared for a few years while we make sure that we are not making another fatal mistake.

case should return to this Court and to provide assistance to my state court colleagues in Tennessee. While my opinions on these issues are of course not binding on the state courts, it is in the interest of best utilizing the extensive judicial resources that have been expended on this case to date to point out the problems with the case as I see them before it goes back to state court.

The issues in this case raise significant questions about whether O'Guinn's rights were violated during the trial and pre-trial process. Collectively, the problems overwhelm the reliability of the conviction and raise a question as to whether O'Guinn is actually innocent of the Cupples murder, as he maintains. This was a terrible crime and it is understandable that the authorities in Tennessee were anxious to find and convict the perpetrator. However, regardless of O'Guinn's guilt or innocence, he is entitled to a fair trial and vigilant protection of his constitutional rights. He received neither in this case. The facts and circumstances mandate that O'Guinn be provided with a new trial where his guilt or innocence can be tested fairly.

While no trial is perfect, the errors alleged in this case are not simply technical errors that had no impact on the outcome of the trial—they were egregious. When balanced against the weakness of the evidence used to convict O'Guinn, the errors weigh heavily. Those errors deserve to be examined fully on the merits. It is not a question of one's views in favor of or in opposition to the death penalty as a theoretical matter. Such considerations are irrelevant. What matters is that the constitutional rights of a defendant have been seriously violated and these constitutional violations should not continue to go unaddressed.

## I.

### The Evidence Used to Convict O'Guinn Was Weak

Kenneth O'Guinn was convicted after a jury trial of murdering Sheila Cupples on May 24, 1981 in Jackson, Tennessee. I believe that the wrong man may have been convicted. The evidence used to convict O'Guinn was extremely weak: (1) No physical evidence ties O'Guinn to the victim or the murder scene. To the contrary, the only physical evidence found at the scene not associated with the victim were brown hairs that affirmatively did not belong to O'Guinn; (2) Only two witnesses claim to have seen O'Guinn with the victim the night of the murder and both lack credibility. One of those witnesses has recanted her testimony and the other witness, due to severe cognitive and mental problems, lacks any credibility whatsoever; and (3) The confessions given by O'Guinn, since recanted, lack reliability even on a cursory reading because O'Guinn's statements, when not heavily coached by the police, were completely inconsistent with the facts known to the police about the murder. The reliability of the confessions is also suspect due to the impaired physical and mental state of O'Guinn at the time he gave them. This is the totality of the evidence used to convict O'Guinn.

Significantly, O'Guinn's name did not surface for two years following the Cupples murder, despite investigation by the Jackson police and the Tennessee Bureau of Investigation. O'Guinn only came to the attention of the Tennessee authorities when he was arrested in Alabama on an unrelated charge. Not one of the many witnesses interviewed by law enforcement authorities in the weeks and months after the murder ever mentioned the name Kenneth O'Guinn or described him. The police interviewed many people who were at the bar the night of the murder and at that time no one identified him as being there. Furthermore, evidence gathered by the Tennessee authorities but withheld from O'Guinn's trial counsel strongly indicates that others from the Jackson area may have been involved with or had knowledge of Sheila Cupples' murder.

### A. Eyewitnesses

The totality of the evidence against O'Guinn at trial consisted of two eyewitnesses and the confessions given by O'Guinn. That was the whole case. None of this evidence is trustworthy. Out of scores of people who saw the victim at a local bar the night of her murder, only two witnesses testi-

fied to having seen the victim with O'Guinn at the bar: one a man of admitted limited cognitive abilities and the second a woman who sought to curry favor with the police to mitigate her own legal troubles and later recanted her testimony and admitted in federal court to perjuring herself at O'Guinn's trial.

Danny Dunn, one of the witnesses who testified against O'Guinn, is a man of low intelligence who cannot read and who attends a special facility due to his mental problems. In 1981, shortly after the murder, Mr. Dunn had given the police a description of the man he saw with Sheila Cupples at the Hat & Cane (the Jackson, Tennessee bar where Sheila was last seen alive) the night of her murder. He described a tall man (6'4") with a medium build. This description is at odds with the physical description of Kenneth O'Guinn, who is 5'9" and weighed about 190 pounds at the time of the murder. The description given by Mr. Dunn fairly describes several of the "regulars" at the bar known to be friends of Sheila, including Bill Dix and Del Ehrett. Although Mr. Dunn stated that the man he saw with Sheila was not either of these men and that the man was a "complete stranger" to him, it should be noted that Mr. Dunn was unable to identify from photographs several of the other "regulars" at the bar who were friends of Sheila. Apparently, many of the "regulars" at the Hat & Cane were strangers to him as well. This is not surprising, as Mr. Dunn testified that he had been frequenting the Hat & Cane for only three weeks at the time of the murder and apparently did not know Sheila or any of her regular crowd very well. *See generally* Trial Testimony of D. Dunn, J.A. at 873–89 and Habeas Testimony of D. Dunn at 219, J.A. at 694.

Mr. Dunn's trial testimony describing the person he saw that night with Sheila is not very compelling and indicates that the witness was confused and unsure about what he saw:

On cross-examination:

Q.  Do you deny saying that the man was medium build?

A.  No, sir, I didn't say that did I?

.     .     .     .     .

Q.  So if Agent Leach has down in his interview—

A.  Well at that time *I was probably back and forth about things, sir.*

Q.  Sir?

A.  *I said about that time I was probably back and forth about them [sic] things, sir.*

Q.  All right.  Do you deny describing the man as dark headed?

A.  He had dark hair *at that time.* . . .

On redirect:

Q.  [Defense counsel] asked you about dark hair . . . What do you mean by [back and forth on that?] . . .

A.  *It means in one way I was thinking one way and another way sometimes— sometimes my mind plays tricks, but at that time I did see the black hair.*

Q.  When you say it plays tricks, it would be lighter than darker sometimes? . . .

A.  Yes, sir . . . .

On recross:

Q.  "Sometimes my mind plays tricks[?]"

A.  Yes, sir.

Trial Testimony of D. Dunn, J.A. at 886–89. This vacillating and confused testimony by a mentally defective witness is now the only direct evidence against O'Guinn that has not been recanted.[2]

The only other eyewitness to testify against O'Guinn at trial was Diana King (now Diana Pitsenbarger).  She was employed by the Hat & Cane as a waitress at the time of the murder.  Although no statement was taken from her during the initial investigation,

---

2.  The photographic lineup shown to Mr. Dunn two years after the murder was also questionable both as to its reliability and legality.  When first asked by police to pick out the person he saw that night with Sheila at the bar, Mr. Dunn stated that he could not do so.  After some coaching by the police and being told that the man was in custody and had confessed, Mr. Dunn picked O'Guinn out of a lineup that contained two pictures of O'Guinn, one with O'Guinn wearing prison-issue clothing.  This suggestive identification might well constitute another violation of O'Guinn's due process rights.

two years later (and shortly after O'Guinn's indictment for the Cupples murder), Diana was arrested. Her connection to the Hat & Cane came to the attention of the police and prompted her statement and subsequent testimony. Ms. King testified at O'Guinn's trial in 1985 that she danced with Mr. O'Guinn at the Hat & Cane the night of the murder and saw him there with Sheila. In 1991, however, Ms. King recanted the identification of O'Guinn she gave at trial. In recanting her testimony, Ms. King gave an affidavit in 1991 and testified at the habeas hearing in 1993 that she did not know Kenneth O'Guinn and would not have known whether he was in the Hat & Cane on the night of the murder. Ms. King testified at the habeas hearing that she lied at trial because the police had threatened to arrest her on some unrelated charges and she believed she would help herself if she cooperated with them.

Without any explanation, the District Court found Ms. King's testimony not credible. In assessing her credibility, however, the motivation and circumstances behind her trial testimony must be examined. First, Ms. King's name did not surface in the investigation and she was not interviewed about her knowledge of the case until two years after the murder. No contemporaneously-made record against which to evaluate her testimony exists. Instead, there is the testimony given by a woman two years after the murder who was looking to curry favor with the police and stated in her affidavit recanting her testimony that she would have said whatever they wanted to hear at that time. This does not make for a very compelling witness against O'Guinn. Ms. King's motivations for cooperating with the police at that time are clear and the prosecutor's need for a cooperative witness at that time is also clear. Conversely, Ms. King came forward voluntarily in 1991 to recant her testimony. She was under no threat from the police at that time and, unlike in 1985, there was no apparent motivation for her to lie in her affidavit.

In my judgment, the testimony of these two witnesses is virtually worthless. The only other evidence is O'Guinn's confessions, which are just as unreliable.

## B. *The Confessions*

On August 12, 1983, after forty-two days of incarceration, numerous interrogations by at least three law enforcement officers from two states, without the benefit of legal counsel, and in a weakened physical state due to illness, O'Guinn confessed to the murder of Sheila Cupples in a series of oral and written statements. The circumstances suggest that O'Guinn may have falsely confessed. At the time of the confessions, O'Guinn had previously sought help for serious mental and emotional problems. In addition, he was experiencing excruciating pain from numerous tooth extractions and other physical ailments. Due to the pain from the tooth extractions, for which he had not been given medication, O'Guinn had not been eating or sleeping properly prior to giving the confessions. O'Guinn's physical condition alone makes the reliability of the confessions questionable. Furthermore, O'Guinn's low intelligence and ninth-grade education call the reliability of the confessions into question and may have made him susceptible to the pressures exerted by the authorities.

The actual text of O'Guinn's statements is the most telling evidence of how unreliable the confessions are. The information given by O'Guinn to the police about the murder simply did not comport with the information known to the police. In reading the confessions and statements, O'Guinn's statements never "matched" what the authorities wanted him to say until the police prompted or led him. At the point that O'Guinn gave the confessions, he had been questioned and coached about the Cupples murder for weeks and had obtained quite a bit of knowledge from the police about the murder. His confessions reflect this in that they are stated in only the broadest terms, such as stating that he choked Ms. Cupples, information he had received from the police. Whenever O'Guinn was pushed to give details, he invariably gave information at odds with the actual facts and the police, not receiving the answer they wanted, would then coach O'Guinn until he said what they wanted.

The discrepancies in the details of the confessions are many. For example, when

asked what he did with Sheila's clothing after the murder, O'Guinn said he threw them in the river. As Sheila was found with all her clothes, the police then asked O'Guinn if he threw *all* of her clothes in the river thus causing O'Guinn to try to rephrase his answer. O'Guinn also maintained that he strangled Sheila with his hands and that Sheila was wearing a blue long-sleeved shirt, when in fact Sheila was strangled with the pink halter-type shirt she was wearing. O'Guinn also stated that he killed Sheila at a service station when the evidence indicates that she was strangled in the field in which she was found.

The following is an example of the leading questions asked of O'Guinn and the coaxing in which the police engaged when he did not answer the way they wanted:

Q. Do you remember if you choked her with your hands or with something else, Kenneth?

A. With my hands.

Q. What else? Be honest with me now, you don't con me ...

A. I cannot ... I cannot remember of using anything on her but my hands. That's all I can remember.

Q. (Can't understand tape)

A. I think, I'm not for sure now. I think ... I not for sure about I think I took her blouse and put it around her neck. She had a long sleeve blouse on and I think I used that around her neck.

Statement of K. O'Guinn at 3, J.A. at 269. This type of continued rephrasing of the questions and answers occurred for every point of the confessions until something approaching the desired answer was given. A careful reading of the statements demonstrates that O'Guinn was merely guessing at what the police wanted him to say, and he appeared to allow them to lead him where they wanted him to go. When the police would question his answers he would vacillate and then say either he didn't remember or he wasn't sure. O'Guinn gave virtually no

details in the confessions that comport with the facts as the police understood them. *See generally* Statements of K. O'Guinn at J.A. 269–305.

The compromised physical and mental state of O'Guinn at the time of the confessions, as well as the form of the confessions, which resulted from a great deal of leading and suggestion on the part of the police, calls into question their reliability and the reliability of his conviction. In addition, as discussed below, the admissibility of the confessions is at issue because O'Guinn did not understand that he had the right to counsel during questioning. As the Supreme Court stated in 1964, "We have learned of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488–89, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964).

### C. *Physical Evidence*

The only physical evidence found at the crime scene that did not come from the victim were brown hairs that did not come from Kenneth O'Guinn. No fingerprints or other physical evidence were used to tie O'Guinn to the murder. 8/8/83 FBI Lab Report. (J.A. at 343) The police conducted two lie detector tests and a voice stress test concerning the Cupples murder on O'Guinn in 1983. Based on these tests, the police determined that O'Guinn knew something about the Cupples murder. In fact, O'Guinn stated during the lie detector tests that when he was staying with his brother, Robert O'Guinn, in 1982 he overheard Robert speak of killing a girl named Sheila.[3]

In sum, the few pieces of evidence pointing to O'Guinn are of questionable reliability. Accordingly, the legal errors that have been raised by O'Guinn must be carefully reviewed

---

**3.** Michael and Debbie Spears, who were at the Hat & Cane the night of the murder, identified Robert O'Guinn from a photo lineup as the person with whom they saw Sheila in the parking lot that night. Moreover, on July 15, 1983, a Tennessee grand jury indicted Robert O'Guinn for the Cupples murder. The pending indictment against Robert O'Guinn was dismissed, presumably due to the confessions given by Kenneth O'Guinn.

in order to avert a possible miscarriage of justice.[4]

## II.

### *Recent Passage of the Tennessee Post–Conviction Act Warrants a Remand to State Court*

On May 10, 1995, the Tennessee Legislature adopted the Post–Conviction Procedure Act, which replaced Tennessee's then-existing post conviction statute. Tennessee Public Act 1995, ch. 207, § 1, Tenn.Code Ann. §§ 40–30–201 to –222. I believe that the language of the new post-conviction statute is an additional reason for dismissing the federal habeas petition. The new law repeals the former Post–Conviction Procedure Act, Tenn.Code Ann. §§ 40–30–101 to –122, including the waiver provision found at § 40–30–112, and substitutes a number of different provisions stating that relief may be granted "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn.Code Ann. § 40–30–203.

In this case, a number of issues exist that the State seeks to preclude from review due to procedural default at the state court level, for example petitioner's claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), his claim of ineffective assistance of trial and appellate counsel, his claim that his Fifth Amendment rights were violated, and his claim that the language in the Tennessee death penalty statute in effect at the time of his conviction was unconstitutionally vague. The State asserts that these claims have not been adjudicated on the merits by the state courts and that the federal

court is procedurally barred from review of these claims and others. The changes made in the definitions of "waived" and "previously determined," however, may affect consideration of O'Guinn's claims in state court. *See* Tenn.Code Ann. § 40–30–206(g), (h).

## III.

### *Exculpatory Information Was Withheld from the Defense*

O'Guinn's first *Brady* claim is that the State purposely prevented two witnesses who would have exculpated him from testifying (the Spears). This was the only one of O'Guinn's *Brady* claims addressed by the District Court, which only briefly mentioned the issue and ruled, without explanation, against O'Guinn. 870 F.Supp. at 786. The District Court made no findings regarding the documentary claims. Because I believe this claim embodies one of the more serious constitutional errors in this case, I will discuss the merits of O'Guinn's claim as I see them.

To prevail on this issue on the merits, O'Guinn must show (1) that the state withheld exculpatory evidence and (2) that the evidence was material. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Shortly after O'Guinn's trial, the Supreme Court stated a new standard for materiality of withheld evidence. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." [5] *United States v. Bagley*, 473 U.S.

---

**4.** The so-called "map" referred to at the end of section III. B. of Judge Batchelder's dissenting opinion does not support her argument. The "map" supports the view that O'Guinn did not know where the body was found and was simply making up the facts. He places the body on a road that runs east from Highway 45 when in fact the body was found at the end of Conrad Drive which runs West of 45 and is much further from the intersection of I–40 and 45 than O'Guinn's map shows. O'Guinn had been told that the body was found on a side road near an interstate interchange with which he was famil-

iar. Other than this fact, O'Guinn's map does not get anything else right.

**5.** At the time of O'Guinn's trial in early 1985, the standard for determining the materiality of suppressed evidence that was specifically requested was whether the evidence "might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). As will be demonstrated below, the evidence suppressed here was material under *Agurs, Bagley* or *Kyles v. Whitley*, —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The question of materiality looks not to whether the suppressed evidence would have resulted in acquittal, *but whether in the absence of the information the defendant received a fair trial. United States v. Agurs*, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) (emphasis added).

The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379–80. *Brady* simply recognizes the disparity in resources between the defendant and the State and attempts to level the playing field to some extent. Here, in addition to creating an unbalanced playing field, the failure to disclose documents may well have prevented the truth from being uncovered.

A recent Supreme Court case stated that, in assessing materiality, a reviewing court is to assess the *collective* effect the withheld evidence has *in light of the evidence presented at trial. Kyles v. Whitley*, —— U.S. ——, —— ——, 115 S.Ct. 1555, 1569–70, 131 L.Ed.2d 490 (1995) (emphasis added). When such an assessment leads to a determination that undermines confidence in the trial's outcome, the defendant is entitled to a new trial. *Id.* Thus, the weakness of the evidence in the State's case against O'Guinn makes the *Brady* issue particularly important. The evidence withheld from O'Guinn would likely have created a reasonable doubt in the minds of the jurors had they been made aware of even a fraction of it. Neither O'Guinn nor his counsel knew, should, or could have known about the information withheld. Although some of the names may have been available to O'Guinn's trial lawyers, the importance of many of the people named in the documents as potential witnesses would not have been apparent without the statements and the other information possessed by the State.

In addition, trial counsel had only about two months to prepare for a capital case. Given the limited time and resources available to counsel, they were forced to choose a limited number of strategies on which to focus. Counsel for O'Guinn was led to believe that they received the entire O'Guinn file from prosecutors, not some "redacted" version containing only a portion of the materials. In light of their understanding that they had received the entire file, O'Guinn's counsel had no reason to believe that the prosecution had any other evidence. They would therefore not have been aware that there was other exculpatory evidence, already uncovered, for which they should look. In addition, had counsel known of the information in the withheld documents, it is likely that part of their focus at trial would have changed.[6] More important, the failure to turn over the documents left trial counsel unable effectively to cross-examine or impeach certain witnesses. Here, the collective effect of the withheld evidence, particularly when juxtaposed against the relatively weak evidence at trial, undermines confidence in the guilty verdict. O'Guinn's claim that the withheld evidence deprived him of his constitutional right to due process is well supported.

Police records that indicate that other persons had a motive and opportunity to commit the crime in question are, on their face, exculpatory and material, and thus, must be turned over to the defense. Evidence that the victim was last seen with someone other than the defendant, which is likely to raise a reasonable doubt in a juror's mind and is

6. The record is not clear on exactly how much independent information O'Guinn's trial counsel had concerning many of the individuals named in the withheld documents. In the event that trial counsel did have independent knowledge of some of the information in the withheld documents and failed to pursue it, O'Guinn's claim of ineffective assistance of counsel at trial is even stronger. *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir.1992) (failure by counsel to either investigate or interview promising witnesses constitutes negligence, not trial strategy); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.1987) (lawyer who had for no apparent reason failed to investigate a known and potentially important alibi witness had failed to provide effective assistance), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988).

therefore both material and exculpatory, was withheld in this case. Another document that the prosecutor failed to turn over contains information that someone other than the defendant confessed to the murder. This evidence would also fall unquestionably within *Brady* and its progeny.

Due to the large number of statements not disclosed, only some of the most exculpatory and material documents from among those withheld are summarized below. These statements are material because (1) had defense counsel had access to this information prior to trial it is likely that the preparation for trial would have been different and (2) the testimony of certain witnesses might have been discredited, or at least questioned, raising a reasonable doubt as to O'Guinn's guilt in a juror's mind.

1. The victim's cousin, Joannie Couples, threatened Sheila and her parents the week before the murder. As Sheila and her parents were leaving the Hat & Cane, Joannie brandished a knife, threatened to cut Sheila and/or Sheila's mother and yelled as they left "I'll kill you!" Interview of Pamela Johnson, TBI 11/2/81 (J.A. at 525–26); Sworn statement of Robert Strain, TBI report 11/10/81 (J.A. at 565–68); Sworn statement of James Earl Stanfill, TBI 1/4/82 (J.A. at 461–63); Interview with Phillip Tosh by TBI 5/25/83 (J.A. at 562–64). There is also evidence that Sheila and Joannie were fighting over Joannie's ex-boyfriend, Dell Ehrett (AKA "Apple Jack"). Sworn statement of Pamela Jean Johnson, TBI 11/3/81 (J.A. at 532–35); Sworn statement of Dell Ehrett (J.A. at 458–60).

2. Four months after the murder, Joannie Cupples admitted to being involved with Sheila's murder. Joannie confessed to Renee Dees that on the night of Sheila's murder, persons in a blue van abducted Sheila and took Sheila to the Lakeview Motel.[7] Joannie, Joannie's mother, and Alice Fay Cox Stewart (also known as "Wagon") were there. Ms. Dees indicated that it was her understanding from the conversation that "these subjects eventually did kill [Sheila]." Interview with Renee Dees, TBI 9/12/82 (J.A. at 558–59).

Ms. Dees' statement is partially corroborated by several other withheld statements that are exculpatory of O'Guinn when viewed cumulatively or in relation to other information: (1) William Dix owns a blue van and came to the Hat & Cane that evening in the blue van with Alice Stewart, one of the women reportedly at the motel. Statement of William Dix, TBI 11/4/81 (J.A. at 514–16); Statement of Alice Stewart, TBI 11/4/81 (J.A. at 543–44); (2) an informant stated s/he saw Sheila getting ready to leave the Hat & Cane with Bill Dix the night of the murder. Jackson Police Handwritten Notes, dated 5/28/81 (J.A. at 372); (3) a woman informed the Jackson police that she saw a blue van and a car hit at approximately 1:00 a.m. in the parking lot of the Hat & Cane. Jackson Police Handwritten Notes, undated (J.A. at 370); (4) Patricia Moncier also stated that Joannie knew more than she was saying. Jackson Police Handwritten Note, undated (J.A. at 376) and (5) a patron of the Hat & Cane also stated that Sheila and Alice Stewart had been arguing at the bar earlier in the evening and when the patron saw Ms. Stewart the next day she had scratches on her neck. Interview with Johnnie Wayne Howard (AKA "Wildman"), TBI 11/2/81 (J.A. at 523–24).

3. Debbie and Michael Spear, patrons of the Hat & Cane, saw a man and woman scuffling in the parking lot about the time Sheila was last reported seen. The man said the woman was going with him whether she wanted to or not. The man was holding the woman close to him and then dragged her towards a blue van in the parking lot. The woman the Spears described matches that of Sheila Cupples (pink shirt, pink pants and glasses). The man left in a white and blue pickup truck with no tailgate. 11/2/81 State-

---

7. Joannie Cupples also contradicted her first statement when she said she had not been to the Lakeview Motel the night of the murder. *Compare* Statement of Joannie Cupples and Pam Johnson, Jackson Police 5/24/81 (J.A. at 351–53) *with* Statement of Joannie Cupples, TBI 11/5/81 (J.A. at 535–42). These two statements apparently were turned over to O'Guinn's counsel. The significance of the discrepancy, however, may not have been readily apparent to defense counsel without benefit of the other evidence, much of it withheld, that Joannie may have been in some way involved with the murder.

ments of Michael and Debbie Spears (given to police separately) (J.A. at 527–29 and 530–31, respectively).[8]

Corroborating the statement of the Spears is the following: (1) Betty Porter said someone saw a man in the parking lot holding a woman in a headlock, dragging the woman across the lot as another woman pushed the captured woman from behind as the captured woman cried, "Please let me go." Jackson Police Handwritten Notes, 6/3/81 (J.A. at 375) and (2) Del Ehrett owned a blue and white pick up truck with no tail gate at the time. Jackson Police Handwritten Notes, undated (J.A. at 377). As to Mr. Ehrett, police noted discrepancies in the alibi of Mr. Ehrett concerning his whereabouts between 1:00 a.m. and 3:00 a.m. the morning of the murder. *See* Interview of Del Ehrett, TBI 11/4/81 (J.A. at 458–60).

4. A Hat & Cane patron stated that he heard a man from Henderson, Tennessee state that he had Sheila killed for "narcing" on him. Sworn statement of Ricky Glenn Erwin, TBI 11/3/81 (J.A. at 536–38).

Whether these statements are true is not the issue for purposes of *Brady*. The issue is whether the *existence* of these statements should have been disclosed to the defense in order for O'Guinn to receive a fair trial. Had the contents of all or part of any of these statements been testified to at trial, it is very possible that a reasonable doubt could have been raised in a juror's mind. Furthermore, I do not doubt that the strategy defense counsel used to defend O'Guinn was influenced by their lack of knowledge of other possible suspects and events. The trial might have taken a different course "had the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. It is up to defense counsel to go through the evidence, but it must have all the material evidence to do that job properly.

The State's arguments that its failure to turn over these materials was unintentional are unavailing. The Supreme Court has held

that where the withheld information is material to either guilt or punishment, like the information here, whether the state acted in good or bad faith is immaterial to whether a due process violation occurred. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. It is uncontested that O'Guinn's trial counsel requested copies of any documents "that in whole or in part support the innocence of defendant and/or are exculpatory in nature. . . ." It is uncontested that the state gave counsel what was represented as a complete file of the Cupples case. Letter from D.A. Woodall to P. Martin, dated 11/21/84 (J.A. at 409). Counsel for O'Guinn testified that he copied the entire file that he was given except for a few photographs. It is uncontested that, based on a comparison of defense counsel's file with documents O'Guinn received through discovery during the federal habeas process, many documents were withheld from O'Guinn before his trial. Thus, the withholding of material and exculpatory evidence creates a strong possibility that the outcome of the trial might have been different.

## IV.

### *Ineffective Assistance of Counsel*

**A.** *O'Guinn's Ineffective Assistance Claim Has Not Been Procedurally Defaulted*

The state courts will now have before them this important issue, and they can decide whether to address it directly or whether to deem it previously determined or waived. The federal law on this subject should assist the state courts in this undertaking.

Habeas corpus, in general, provides for federal court review of constitutional claims that have been previously determined—in other words, there has been a ruling on the merits by the state courts. The federal courts may also review constitutional claims where it is unclear whether the claim has been previously determined. In contrast, where a claim has been decided on state

---

8. At the District Court hearing, the Spears testified regarding their failure to appear at O'Guinn's murder trial to testify. The District Court found that this testimony was not credible.

870 F.Supp. at 786. The District Court's credibility determination does not appear to extend to earlier statements the Spears made regarding their observations on the night of the murder.

grounds, such as waiver or other procedural default, the federal courts will not review the claim (unless there is cause and prejudice for the default). In this case, the state court of appeals rejected a number of O'Guinn's claims with the blanket statement that the claims had been "waived *or* previously determined." Among these "waived or previously determined" claims was O'Guinn's ineffective assistance of counsel claim. The State argued to this Court that the state court of appeals found the claim waived. The record demonstrates that there has been no statement by the state courts "clearly and expressly" resting the denial of the claim on a state procedural ground such as waiver.

In *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Supreme Court made it clear that procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar. In that case, Harris filed a petition in Illinois state court for post conviction relief based on ineffective assistance of counsel. The state trial court dismissed the petition and the Illinois appeals court affirmed. The appeals court, while concluding that Harris could have raised his ineffective assistance claim on direct review, and stating that those issues that could have been presented on direct review are considered waived, went on to consider Harris' claims on the merits. On federal habeas review of Harris' claim, the Supreme Court concluded that the state court decision rested primarily on federal law because the Illinois appeals court did not "clearly and expressly" rely on waiver as a ground for rejecting Harris' federal claim. *Harris*, 489 U.S. at 263, 109 S.Ct. at 1043 ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."). Similarly, in *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991), the Supreme Court held that

if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those [federal] claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the opinion.

*Id.; see also Caldwell v. Mississippi*, 472 U.S. 320, 327–28, 105 S.Ct. 2633, 2638–39, 86 L.Ed.2d 231 (1985) (presumption of federal jurisdiction on habeas review where state court's decision appears to rest primarily on federal law, absent a clear and express statement that the decision is based on independent state grounds); *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983) (same). The Court went on to clarify by stating that the presumption in *Harris* applies "where a federal court has good reason to question whether there is an independent and adequate state ground for the decision." *Coleman*, 501 U.S. at 739, 111 S.Ct. at 2559.

The conclusion that O'Guinn's ineffective assistance claim has not been waived is supported by the record. In its order concerning O'Guinn's first post-conviction appeal, the state trial court found, *sua sponte*,

Petitioner did not assert that his trial attorneys in the State of Tennessee were ineffective either at trial or on appeal.... [T]here was no testimony elicited at the hearing which directly attacked the competency of Petitioner's *Tennessee counsel*. Further, *the Court finds affirmatively from the evidence* that the Petitioner did receive the effective assistance of counsel as provided by *Mr. Patrick Martin and Mr. Charles Farmer* [O'Guinn's Tennessee trial and direct appeal counsel].... The Court is of the opinion that Petitioner was provided with effective assistance of counsel and that both were experienced trial attorneys who represented Petitioner competently and ably at trial and on appeal.

*O'Guinn v. State*, No. C–87–23, Slip op. at 2 (Tenn.Cir.Ct. July 5, 1988) (emphasis added). On appeal of this ruling, the Tennessee court of appeals spoke to the issue of the effectiveness of O'Guinn's *Alabama pre-trial counsel*, noting that O'Guinn "finds no fault with trial counsel['s failure to raise the ineffectiveness

of Alabama pre-trial counsel], indicating a belief that any ineffective assistance claim regarding his Alabama pre-trial counsel's performance had been waived." *State v. O'Guinn,* 786 S.W.2d 243, 246 (Tenn.Crim. App.1989). However, this statement in no way disturbs the trial court's statement set out above.[9]

The record here simply cannot support the notion that O'Guinn's Tennessee ineffective assistance of counsel claim has been deemed waived by the state courts. Although the Tennessee appeals court made the blanket statement that all of O'Guinn's remaining claims (including the ineffective assistance of trial counsel claim) had been either "waived or previously determined within the meaning of T.C.A. § 40–30–112," *State v. O'Guinn,* 1990 WL 58740, at *1 (Tenn.Crim.App. May 9, 1990), this statement by the Tennessee appeals court does not "clearly and expressly rely on an independent and adequate state ground" to decide the claim, as required by *Harris* and reaffirmed in *Coleman.* This blanket statement declining to review a number of claims, in fact, provides ample reason to question whether the denial of the ineffective assistance claim was based on waiver, a state ground, *or* a previous determination that counsel's conduct did not violate O'Guinn's constitutional rights, which a federal court must review on habeas. The language employed by the Tennessee court of appeals, looked at in light of the earlier pronouncements by the state courts regarding the first petition, gives a federal court good reason to question whether there is an adequate and independent state ground for the decision.

The conclusion that the claim has not been waived is also supported by the Supreme Court's decision in *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). In *Ylst,* decided on the same day as *Coleman,* the Supreme Court stated that

where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appear[s] to rest primarily on federal law," ... we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.

501 U.S. at 803, 111 S.Ct. at 2594. To the extent that the decision by the state court of appeals regarding O'Guinn's second post conviction petition can be read to be "unexplained" due to its use of the words "waived or previously determined," the only sources to which a federal reviewing court may refer are the earlier opinions from the first post conviction proceeding. These opinions simply cannot be read to "expressly" dismiss the claim of ineffective assistance of Tennessee counsel on procedural grounds. Furthermore, in this case, unlike in *Coleman,* the notion that the most plausible explanation for the state court's dismissal is that the state court of appeals' decision rested on state procedural law is simply not supported. The most plausible explanation—and the only one supported in the record—is just the opposite.

A federal court's review of a claim of ineffective assistance of counsel is consistent with principles of federalism, comity and respect for the finality of state court rulings where the state court has not "clearly expressed" a state law basis for its views on the issue. Review of these claims does not in any way contravene the well-settled rule that federal courts should defer to state procedural default rules where they are clearly relied upon by the state court in determining a federal claim. The only state court to address directly O'Guinn's ineffective assistance of counsel claim did not make the plain statement required under *Harris.* No subsequent state court disturbed that ruling. Given that lack of a "clear and express"

9. The fact that state law was also referenced in the order does not negate that the decision "fairly rests" on federal law and is therefore subject to this Court's review. Like *Long, Caldwell* and *Harris,* state law was invoked in the state court opinion in this case in some manner, but the state ground was not the "adequate and independent" ground necessary to preclude federal habe-

as review. In *Coleman,* on the other hand, the Virginia Supreme Court clearly relied on state law to dismiss the petitioner's appeal. Petitioner Coleman had filed his appeal outside of the thirty day limit and the Virginia Supreme Court explicitly granted the State's motion for dismissal solely on state procedural grounds. That is not the case here.

statement barring review of the claim in federal court on procedural grounds, the federal court has a duty to review ineffective assistance of counsel claims.

### B. O'Guinn's Received Ineffective Assistance of Counsel at Sentencing

As to the merits of O'Guinn's claim, it is clear that O'Guinn's counsel at sentencing was ineffective. In order to succeed in this claim, O'Guinn must show two things: first, that counsels' performance was deficient, and second, that petitioner was prejudiced thereby. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsels' total failure to investigate O'Guinn's background and the wealth of mitigating evidence that was there to be found, if they had bothered to look, amply satisfies these two requirements.

At the sentencing phase of a capital trial, the jury must consider the facts and circumstances of the crime and the character and background of the defendant. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). These facts and circumstances must include "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* This is because "[t]he Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990). However, the Constitution does not merely require that whatever mitigating evidence proffered be considered, it also requires that counsel reasonably investigate the facts of defendant's background and then present such evidence to the extent it is available. As in the guilt/innocence phase of trial, failure even to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel. *Glenn v. Tate,* 71 F.3d 1204, 1206–08 (6th Cir.1995) (counsel provided ineffective assistance where information not presented to jury as sentencing because counsel made virtually no attempt to prepare for sentencing phase); *accord Blanco v. Singletary,* 943 F.2d 1477, 1501–02

(11th Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (same).

Like many states, mitigation investigation in Tennessee is literally of life and death importance, for if the mitigating evidence is insufficient, the defendant is sentenced to death. In this case, each of O'Guinn's two attorney's thought the other was handling the investigation of mitigating evidence to be presented at the sentencing phase of the trial. As a result, virtually no mitigating evidence about O'Guinn was discovered or presented. O'Guinn's sentencing hearing was conducted immediately after the guilty verdict was returned. Only one witness, O'Guinn's mother, was called on behalf of O'Guinn and she was asked very general questions about O'Guinn's childhood. A reading of the direct examination takes approximately 90 seconds and fills less than three pages of transcript. This failure on the part of his attorneys goes beyond ineffective. It strikes closer to total incompetence. As the District Court noted:

> The hearing on O'Guinn's petition disclosed that Mr. Martin thought that Mr. Farmer would investigate the sentencing factors. Mr. Farmer thought he was only in charge of the sentencing argument, and no one investigated O'Guinn's background. Considering the importance of a sentencing hearing, the failure to investigate and put on mitigating evidence amounts to the deficient performance of counsel.

870 F.Supp. at 785. This was no strategic choice not to present mitigating evidence, which would at least be defensible. Here, the attorneys utterly failed to even look for anything that would cause a jury to consider giving their client a life sentence rather than death.

The prejudice resulting from counsels' failure to investigate and present mitigation evidence is clear. The District Court listed some of the evidence that could have been presented on behalf of O'Guinn:

> In this case, had counsel investigated O'Guinn's background and character, they could have presented strongly mitigating evidence based upon which the jury might have refused to impose the death penalty.

Summarizing this evidence, the jury would have considered that O'Guinn grew up in abject poverty. His parents abused his siblings and him both physically and sexually during their childhood. His parents brought alcoholism and criminal behavior into the family. O'Guinn ran away from home repeatedly to escape his home life. He suffered lasting emotional trauma when he accidentally killed a woman while driving a carnival truck. O'Guinn eventually married and worked regularly to support his wife and their three children, but he suffered additional emotional trauma when [his wife] had an affair with his father and broke up their marriage. There is additional evidence of the same character.

870 F.Supp. at 786. This "additional evidence" included neglect. The children were either left at home or kicked out of the house on a regular basis. O'Guinn was diagnosed as being near a nervous breakdown while still in grade school because of his parents' actions. O'Guinn attempted to seek refuge at relatives' homes because conditions were so poor at home. The bug infestation was so bad, according to testimony, that O'Guinn's father was treated for an ear problem caused by "a large roach that had taken residence up inside [his] ear." Superseding Petition for Writ of Habeas Corpus at 92 n. 47 (J.A. at 108). O'Guinn even plotted crimes with hopes of being caught because he believed prison life would be an improvement.

Based on this evidence and testimony adduced at the habeas evidentiary hearing, the District Court concluded:

> The court finds that had the jury considered this evidence, there exists a reasonable probability that it would not have sentenced O'Guinn to die for the murder of Sheila Cupples. This establishes a prejudicial deficiency in counsel's performance, which resulted in a violation of O'Guinn's right to the effective assistance of counsel at sentencing.

870 F.Supp. at 786. These conclusions are entirely reasonable and go no further than the facts require. This is not a case where evidence of mitigating circumstances which might raise a reasonable doubt as to whether O'Guinn should be put to death was nonexistent. Nor did counsel make a reasoned decision to withhold the information for tactical reasons.

The failure to prepare adequately for the sentencing phase of the trial, coupled with the failure to present mitigating evidence, resulted in ineffective assistance of counsel at sentencing. In this case, what we know is that a man will die in Tennessee's electric chair as a result of a decision made by jurors who, because of the utter carelessness of trial counsel, were missing crucial and constitutionally required evidence. This pitiful excuse for a mitigation hearing cannot be justified. It is now up to the state courts to determine whether they will revisit this issue.

## V.

### *The Confessions Were Not Knowingly and Intelligently Given, in Violation of O'Guinn's Fifth Amendment Rights*

In addition to the factual circumstances described above, which call into doubt the reliability of O'Guinn's confessions, the legal question concerning admissibility of the confessions is also at issue. O'Guinn did not understand that he had the right to counsel during the questioning, and thus the confessions were not knowing and intelligent, in violation of the Fifth Amendment. This conclusion is based on the testimony of Investigator Duffey. At the Tennessee suppression hearing, Investigator Duffey stood by his earlier statement (made under oath at the Alabama suppression hearing) in which he admitted that he did not know how to obtain a lawyer for O'Guinn and where he admitted that, when he spoke to O'Guinn in July, he might have told O'Guinn that he could not have counsel until he went to court.

The Tennessee trial court made no specific finding whatsoever on this point. Although the Tennessee Supreme Court found that "implicit in the trial court's findings is that Investigator Duffey never misrepresented defendant's right to counsel," *State v. O'Guinn*, 709 S.W.2d 561, 565 (Tenn.1986), this is merely speculation, as the transcript of the Tennessee suppression hearing reveals

that no such finding was ever made. In addition, contrary to the State's assertions, the District Court did not rely on facts outside the record. Although reference was made by the District Court to testimony given at O'Guinn's Alabama suppression hearing, the actual transcript of which was not entered into the record in Tennessee, the Tennessee suppression hearing transcript contains numerous specific references to the Alabama testimony. Investigator Duffey was confronted with the exact portions of his Alabama testimony to which the District Court made reference at the Tennessee hearing. It was entirely proper for the District Court to closely examine those portions of the Tennessee suppression hearing that referred to the previous Alabama testimony.

After holding a hearing, the District Court found the facts relevant to O'Guinn's Fifth Amendment claim as follows: On July 4, 1983, O'Guinn was arrested by the Sheriff's Office of Madison County, Alabama for the rape and assault of an Alabama woman. Alex Duffey, an investigator with the Madison County Sheriff's Office, informed O'Guinn of his Miranda rights, which O'Guinn waived by signing a form, and began questioning him about the rape and assault. Several days later, in an effort to see if O'Guinn had any information about an unsolved 1982 Alabama murder, Investigator Duffey asked O'Guinn if he had ever killed anyone. O'Guinn stated that if he was to be questioned about murder he wanted to have an attorney present. Investigator Duffey erroneously informed O'Guinn that in order to have counsel appointed for him, O'Guinn would need to go to court. O'Guinn reasonably believed from this information that the only way he could obtain legal assistance was to be charged with murder, which would result in a court appearance where he could request court-appointed counsel.

O'Guinn could not make bond on the Alabama charge so he remained in prison. Upon learning that O'Guinn was from Jackson, Tennessee, Investigator Duffey contacted the Jackson Police Department on July 7, 1983. The Jackson police were told about the Alabama murder, despite the fact that O'Guinn had not been charged with that murder, and due to similarities between the Cupples murder and the Alabama murder, the Jackson, Tennessee Police decided to come to Alabama to question O'Guinn about the Cupples murder. On July 11, 1983, Investigator Blanton from the Jackson, Tennessee police traveled to Huntsville to question O'Guinn about the Cupples murder. Investigator Blanton conducted two lie detector tests and a voice stress test concerning the Cupples murder on O'Guinn outside the presence of an attorney.

Based on these tests, Investigator Blanton determined that O'Guinn knew something about the Cupples murder. In fact, O'Guinn stated during the lie detector tests that when he was staying with his brother, Robert O'Guinn, in 1982 he overheard Robert speak of killing a girl named Sheila.[10] Based on this information, Investigator Blanton took a hair sample from O'Guinn. The hair sample did not match with the hair sample found on the body of Sheila Cupples.

Over the next month, investigators from both Alabama and Tennessee questioned O'Guinn repeatedly about the Alabama and Tennessee murders. On August 10, 1983, O'Guinn's court-appointed attorney for the rape and assault charge, Mark Sandlin, told the investigators they could question O'Guinn on any matters unrelated to the rape and assault outside Mr. Sandlin's presence.

On August 12, 1983, O'Guinn asked to see Investigator Duffey. Investigator Duffey again administered Miranda warnings and questioned O'Guinn about the murders. O'Guinn implicated himself in the Alabama murder and was charged. O'Guinn was also questioned on August 12, 1983, by Agent Leach of the Tennessee Bureau of Investigation. Agent Leach did not advise O'Guinn of his Miranda rights because Investigator Duffey told him that he had already done so that day. O'Guinn confessed to the Cupples murder that day.

At the *Alabama suppression hearing*, Investigator Duffey testified as follows concerning the events of July 1983:

On cross-examination:

10. *See supra* n. 3.

Q. Did [O'Guinn] not express to you, after you had advised him of his rights, or at the time you advised him, that because it was murder he felt he was going to need a lawyer?

A. He could have, I don't remember but he could have.

.     .     .     .     .

Q. Is that not what you told Mr. O'Guinn on this occasion that yes, they would give him a lawyer when he got to court?

A. I may have told him that if he went to court that the courts would appoint him one.

*State of Alabama v. O'Guinn,* 462 So.2d 1052, 1053 (Ala.Crim.App.1985).

Further testimony at that Alabama suppression hearing by O'Guinn was as follows:

Q. Did you ever in any subsequent times when you were questioned by him, or other investigators, when you were advised of your rights prior to subsequent questioning, did you ask again for an attorney?

A. No, sir, because I had the understanding I had to go to court before I could get one.

*Id.* The Alabama court found that O'Guinn was effectively denied right to counsel. The Alabama state trial court suppressed O'Guinn's statements relating to the crime, finding explicitly that O'Guinn's waiver of his right to counsel was not knowing and intelligent, because he was misled by Investigator Duffey's original statement that O'Guinn had *no right to counsel without going to court.* The Alabama court found this misapprehension infected all the subsequent questionings and any statements made in response to those questions could not be used against O'Guinn. *State v. O'Guinn,* 462 So.2d 1052, 1054 (Ala.Crim.App.1985). Apparently, O'Guinn was never tried for the Alabama murder.

O'Guinn also made a pretrial motion in the Tennessee trial court to suppress the four confessions given in the Cupples case, contending that Investigator Duffey misinformed him of his right to counsel and his waiver could not therefore be knowing and intelligent. *At the Tennessee suppression hearing* the following exchange occurred between Investigator Duffey and O'Guinn's counsel:

On cross-examination:

Q. ... Do you remember the first time when you raised in your interview or interrogation of Mr. O'Guinn the possibility of committing a murder, either in Alabama or Tennessee?

A. July the 4th.

.     .     .     .     .

Q. Now, isn't it true that at a certain point in time that Mr. O'Guinn had indicated to you that if you were going to continue to discuss murder that he better have his lawyer present?

A. No, sir, not to my knowledge.

Q. Now it is correct that there was a hearing in Huntsville, Alabama before Judge Page regarding the Mueller [sic] murder case down there?

A. Yes, sir.

Q. And in fact, it again was a suppression hearing; was it not?

A. Yes, sir.

Q. Now I'm going to ask you—*show you a document* first I suppose. I'll ask you if you can recall in that [Alabama suppression] hearing that *you made the statement that Mr. O'Guinn did say that or could have said that* [he wanted a lawyer present]?

A. No, sir, I don't remember saying that in the motion to suppress evidence down there. I was asked did he request an attorney and I told him not to my knowledge because *in the interview on August the 12th of 1983,* Kenneth Wayne O'Guinn was advised of his rights by me on tape, and he answered that he understood his rights. At no time to my knowledge did Kenneth Wayne ask for an attorney.

After an objection by the State as to relevancy, O'Guinn's counsel, Mr. Martin, continues in an exchange with the court:

... At a point in time it was stated by [Investigator Duffey] that Mr. O'Guinn in fact when they were discussing the murders could have said, "I want a lawyer at this point," ...

*Id.* After another exchange with the lawyer for the State, Mr. Martin continues to question Duffey:

> Q. Agent Duffey, this is what appears to be a cover page of a pre-trial motion to suppress in the Circuit Court if [sic] Madison County, Alabama, and along with that a page that is numbered RT–38 of that hearing. . . . *Does this refresh your recollection that you did in fact indicate during that hearing that Mr. O'Guinn may have in fact asked for a lawyer when you began discussion of the murder case?*

. . . [objection by State]

> A. *Yes, sir.*
>
> Q. *Is that your testimony, Investigator Duffey?*
>
> A. *Yes, sir. . . . I'm not denying I made the statement.* There was one statement that came out in the [Alabama] suppression motion, if Mr. O'Guinn had asked for an attorney, would I know how to have appointed him one. At that time I had to answer, no, sir, I did not know how. . . . At that time I was ignorant to the facts [of how to get a lawyer when someone requests one].
>
> . . . . .
>
> Q. But the point though here is, Investigator Duffey, that on the day you say [O'Guinn] could have made this statement to you about wanting an attorney, you did not cease your interrogation and did not go to the court to get an attorney.
>
> A. I do not remember—On *August the 12th* when [O'Guinn] made the statement pertaining to this, it was placed on tape,

and at no time to my knowledge did he ever ask for an attorney.

*State of Tennessee v. O'Guinn,* Hearing on Motion to Suppress (Jan. 3, 1985) at 30–36, J.A. at 779–85 (emphasis added).

Based on this testimony, one could reasonably conclude, as did the District Court, that (1) Duffey was standing by his earlier testimony (where he admitted he may have told O'Guinn that he could not get counsel until he went to court), and (2) Duffey was asserting that on August 12, O'Guinn never requested an Attorney. 870 F.Supp. at 783–84. Section 2254(d)(8)[11] of the habeas statute states that factual findings made by the state court are presumed to be correct unless the factual determination is not supported by the record. The State contends, incorrectly I believe, that in arriving at this reasonable conclusion regarding the testimony of Investigator Duffey, the District Court (1) failed to defer to the state court's factual findings and (2) improperly relied on information from the Alabama hearing that was not in the Tennessee state court record to find that O'Guinn's waiver was not knowing and voluntary.

First, the District Court did not fail to defer to any Tennessee court factual ruling; it fulfilled its duty to ensure that the findings of the trial court were supported by the record, and in doing so, merely interpreted a totally vague finding in a manner consistent with the state court record. Although the state trial court had ruled the confessions admissible, it did not make any specific credibility findings or detailed findings of fact as to how it arrived at this conclusion, nor did it ever mention the fact that the Alabama state courts had previously ruled on this very same issue.[12] On direct appeal, the Tennes-

---

11. The statute provides in relevant part:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus . . ., a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . shall be presumed to be correct, unless the applicant shall establish or it shall appear, or the respondent shall admit—
>
> (8) or . . . the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d)(8).

12. The findings of the Tennessee trial court, in their entirety, are as follows:

> Mr. O'Guinn takes the position that even though the rights were read to him, he felt that he couldn't have a lawyer until he actually went into court and he was told he might as well answer the questions they were asking him.
>
> I think Mr. O'Guinn also mentioned the fact that one sentence of the Miranda warning was not read to him. The officers stated a number of times that they did read these statements, and it would be unusual for all of them to leave out that one point.

see Supreme Court stated, using the same record the District Court used to reach its findings:

> Although the trial judge did not render detailed findings, as we would have preferred, it is obvious that the trial court accredited the testimony of the two law enforcement officers and not that of the defendant, that he was misinformed by investigator Duffey.... Implicit in the trial court's findings is that investigator Duffey never misrepresented defendant's right to counsel.

*State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn. 1986). The Tennessee Supreme Court's conclusion that the trial court made an "implicit" finding with regard to Duffey's actions demonstrates the lack of an actual factual finding to which the District Court could defer. The Tennessee Supreme Court did not discuss or make findings about Duffey's testimony at the Tennessee hearing, where he acknowledged that he might have told O'Guinn that he could not have counsel until he went to court. While deferring to the trial court's assignment of credibility to Duffey, the District Court still had to make sense of his testimony in some way. Duffey's first assertion was: "I'm not denying I made that statement [that 'I may have told him that if he went to court that the courts would appoint [a lawyer] for him.']." Hearing on Motion to Suppress (Jan. 3, 1985) at 34 (J.A. at 783). Duffey's second assertion was, "... On August 12th when [O'Guinn] made the statement pertaining to this, it was placed on tape, and at no time to my knowledge did he ever ask for an attorney." *Id.* at 36 (J.A. at 785). If Duffey is telling the truth in both instances, then these statements can only mean that O'Guinn did not request a lawyer on August 12th, but that he might have requested one earlier. Thus, the District Court held, reasonably, that no findings could have been made by the Tennessee courts as to dates other than August 12. This is not a case, as the State asserts, where the record supports two alternative findings and this Court is rejecting the state court's finding in favor of its own findings. The

District Court is simply giving meaning to the Tennessee opinions where those opinions do not make themselves perfectly clear as to a fact that is relevant to the legal ruling at hand: whether the confessions were knowing and intelligent.

Second, as the record clearly demonstrates, the testimony of Investigator Duffey at the Alabama hearing was explicitly referred to in the Tennessee hearing, and Duffey was confronted with and shown his earlier statements. The Alabama testimony, therefore, was a part of the state court record in this case and was properly considered by the District Court. Accordingly, even if the District Court did use the transcript it does not matter—the substance of the testimony could properly be used without referring to the actual transcript simply by reading Duffey's testimony at the Tennessee hearing—material that is clearly part of the state court record. Even if it had not been a part of the record, the District Court made the alternate finding that if the Tennessee trial court did find the testimony at the suppression hearing between O'Guinn on the one hand and Duffey and Leach on the other in conflict, such a finding would be clearly erroneous under § 2254. 870 F.Supp. at 784 n. 10. The transcript contains sworn testimony, given under oath by a law enforcement officer that the Tennessee courts have found to be credible, and the testimony relates directly to one of the constitutional issues in this case. Thus, even if the State was correct that the Alabama testimony was not before the Tennessee Court, the testimony could be considered a new fact of which the District Court properly took judicial notice. Section 2254 does not prohibit the kind of review done here by the District Court and I agree with the District Court's conclusion on this alternate ground as well.

I also agree with the District Court that the failure to suppress the confessions did not result in harmless error, as the confessions constitute the most damaging evidence at a trial where there was very little other evidence at all. As described above, no rea-

---

I think the motion should be overruled and the State is going to be allowed to present these statements.

That's all.
Tennessee *Hearing on Motion to Suppress* (Jan. 3, 1985) at 95 (J.A. at 844).

sonable trier of fact would have found O'Guinn guilty beyond a reasonable doubt based solely on the other evidence at trial.

The Tennessee courts appear to have focused so far only on the fact that O'Guinn was advised of his *Miranda* rights numerous times during the questioning that led to his confessions. Counsel did not focus their attention more broadly. Because of this omission, the Tennessee courts apparently did not regard the earlier misinformation as legally relevant. In my opinion, the Tennessee courts should focus on this issue, as did the District Court. As the Alabama state court and the District Court correctly found, if the effect of the misinformation given to O'Guinn by Investigator Duffey on July 4, 1983, was never cured, none of these subsequent waivers were knowing and intelligent and each and every statement made by O'Guinn during the ensuing five-week period might have been a violation of his Fifth Amendment rights. Accordingly, I do not believe that O'Guinn's confessions were knowingly and intelligently given.

## VI.

In this case, the coached nature of the confessions and the circumstances under which they were obtained, coupled with the facial unreliability of the only two witnesses who can connect O'Guinn to this crime, is a pathetic amount of evidence on which to sentence a man to die. The egregious constitutional violations are overwhelming: a large quantity of material, exculpatory evidence was withheld from the defense (a claim which arose only as a result of this petition and the discovery which the petition permitted); trial counsel utterly failed to present any mitigating evidence at sentencing where ample evidence existed, in violation of O'Guinn right to effective assistance of counsel; and O'Guinn's confessions were not given knowingly and intelligently because at the time he gave them he had been, and remained, misinformed about his right to counsel, a clear violation of his Fifth Amendment rights. While there may well be other violations of a constitutional magnitude that have not been addressed, the three analyzed here are more

than sufficient to warrant a new trial for Kenneth O'Guinn.

BOGGS, Circuit Judge, dissenting.

I leave to Judge Batchelder's excellent legal analysis the questions relating to the substantive merits of the petition for a writ of habeas corpus. I write separately to emphasize the extreme oddity of our resolution of this case, and the way in which the court uses the prisoner's own tactical missteps to reach an outcome favorable to him.

Mr. O'Guinn was duly sentenced to death by a Tennessee jury more than eleven years ago. After having had all of his entreaties rejected on three separate trips through the Tennessee legal system (direct appeal in 1986, post-conviction relief in 1987–89, and second post-conviction relief in 1989–90), O'Guinn finally chose to file a habeas petition in federal court in October 1990. There is no indication that the investigative and discovery tools that developed the material allegedly supporting the *Brady* claim during the federal court proceedings did not also exist in the two state court proceedings that O'Guinn had pursued for the previous three years. After having the case under advisement for two and one-half years, the district court ruled in O'Guinn's favor, indicating that not only was the death sentence invalid, but that a new trial was warranted. To this point, the prisoner, the state prosecutors (presumably representing the interests of the State of Tennessee), and the federal district court had not perceived (or had not chosen to raise) the problem that the federal habeas corpus petition contained an unexhausted *Brady* claim.

Petitioner was happy with his victory, and the attorneys representing the interests of the State of Tennessee, apparently hoping to succeed on the merits of their position, did not press for yet another round of proceedings in Tennessee courts, but appealed to this court. When a panel of this court decided the case in 1994, it reversed on the merits and directed that the writ be dismissed, thus placing O'Guinn on a direct track toward execution. It was only at this point (in fact, only after an *en banc* petition had been granted) that O'Guinn's counsel drew another arrow from their quiver by raising the *Brady*

claims in a third state post-conviction petition (in effect, a fourth round of appeals in the Tennessee state courts).

At this point, however, O'Guinn did not pursue the logic of this position by requesting the dismissal of the federal habeas action that he had now been pursuing for more than five years. Thus, O'Guinn maintained the best of both worlds. If the *en banc* court could be persuaded to the substantive position held by the dissenting judge on the panel and by the district judge, then O'Guinn would succeed on the merits. If, however, it appeared that the merits argument was going against him, he might be able to prevail on the argument that there should not be any merits conclusion at all but that the whole process should go back to state court, thus returning the situation to where it had been at least six years earlier. Furthermore, if those state proceedings then concluded adversely to O'Guinn, he would be able to return to district court (presumably to the same district judge) and re-commence the proceedings where they had been in October 1990, save only that he would now be more than six years closer to a natural death.

I cannot imagine that *Duckworth* and *Granberry*, cited by the *per curiam* opinion for that proposition at page 5, *supra*, ever intended such a result. The *per curiam* correctly paraphrases *Duckworth*, and I agree, that the state "should be afforded [the] first opportunity to correct [a] constitutional violation." In fact, O'Guinn graciously gave the Tennessee courts three such opportunities, but each time neglected to raise the *Brady* issue.

Both *Duckworth* and *Granberry* actually address instances where a defendant was trying to use the federal courts to end-run state courts. In *Duckworth*, a defendant was granted a writ of habeas corpus by the Seventh Circuit on a claim that had not been raised in either state court or the federal district court. The Supreme Court, upon the petition and argument of the State of Indiana, held that the prisoner should be required to exhaust this claim in state court. It especially noted that the exhaustion requirement "serves to minimize friction between our state and federal systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Duckworth*, 454 U.S. at 3, 102 S.Ct. at 19.

*Granberry* indicated that this rule was not absolute. It considered the situation where a non-exhausted issue was raised in the district court, and the State of Illinois had not objected there, but did object before the court of appeals. The Supreme Court refused to make the exhaustion requirement an absolute bar to appellate consideration, regardless of the circumstances (a rule that would vindicate the per curiam opinion). *Granberry*, 481 U.S. at 133, 107 S.Ct. at 1674–75. It also refused to make the state's failure to raise the issue below an absolute waiver (a rule that would, ironically, serve the asserted interests of the State of Tennessee in this case). *Ibid.* Instead, it directed the appeals court in such a situation to weigh the circumstances case by case, in the context of whether the State's request for remand should be granted.

The Court did not face (indeed, did not contemplate the possibility of) our situation, where the prisoner is himself seeking remand for consideration of issues that he failed to raise in state court, while the State of Tennessee requests the appeals court to decide the very issues the defendant has brought to us.

While the Supreme Court did quote the language of earlier cases that say exhaustion is required unless there are "exceptional" or "unusual" circumstances, none of the quoted cases contemplate the exceptional case that we have, where the defendant, perhaps taking guidance from the dissent to the panel opinion, seeks an additional opportunity to exhaust claims that he has failed on at least three prior occasions to raise. Of course, now that such a stratagem has succeeded, such cases will very likely be anything but unusual or exceptional.

In *Granberry*, the official representatives of "comity and federalism" at the state level were *seeking* the state's opportunity to address a claim. Here, those representatives do not wish to give O'Guinn the benefit of his "heads I win, tails you lose" approach. It

seems a very strange type of "comity" that allows the prisoner to use the truly breathtaking footwork at issue here to gain an additional six years of time in which *nothing* effective will have happened in the great flow chart of federal habeas death penalty jurisdiction. *See* Ronald J. Tabak and J. Mark Lane, Judicial Activism and Legislative "Reform" of Federal Habeas Corpus: A Critical Analysis of Recent Developments and Current Proposals, 55 Alb. L.Rev. 1, 9 (1991).

Finally, the *per curiam* opinion correctly states the Supreme Court's holding in *Granberry* that declining to resolve an unexhausted question may be particularly appropriate "if the case involves an important unresolved question of fact or state law or where there is an important state interest at stake ...." (Op. at 1412). In our case, however, the unresolved question is NOT one of state law. Any unresolved question is NOT a question of fact, save perhaps in the minds of the appellate judges supporting the concurring opinion. Finally, the important state interest at stake here would seem to be best represented by the state itself, which in *Granberry* sought remand, but which here seeks finality of decision.

Therefore, while I agree with the legal reasoning of Judge Batchelder, and of the majority of the original panel, I specifically dissent as well on the grounds that the *per curiam* opinion's use of *Granberry* here is completely contrary to its language and intent.

BATCHELDER, Circuit Judge, dissenting.

I must respectfully dissent. For the reasons that follow, I cannot agree that the principles of comity and federalism require that the State of Tennessee be given the opportunity to adjudicate O'Guinn's *Brady* claim. Further, in my view, if the majority of the court is of the opinion that this habeas petition should be dismissed because it contains an unexhausted claim, the appropriate course for the court to take is simply to dismiss the petition, without attempting to advise the state courts or the federal district court what their resolution of the multitude of issues in this case ought to be. However, because the characterization of the facts in the separate concurring opinion is not supported by the record, and that the opinion errs in its statement of the law, I think the separate concurring opinion should not go unanswered.

**I.**

On the night of May 23, 1981, seventeen-year-old Sheila Cupples was at the Hat & Cane Club in Jackson, Tennessee, celebrating her graduation from high school with her cousin, Joanie Cupples, and two other friends. During the evening, Sheila drank beer, took a few Darvon pills, and danced with several different men. By eleven o'clock, Sheila was seriously intoxicated and was helped to the restroom by her cousin Joanie, who said Sheila needed "to straighten up." The last Joanie saw of Sheila was at midnight, when she saw Sheila standing by the entrance to the dance area near the front exit of the Club, looking as if she were waiting for someone.

Two other witnesses, Danny Dunn and Dianna King (now Pitsenbarger), saw Sheila around midnight. Danny was outside the Club when he saw Sheila, in a heavily intoxicated state, trip over a motorcycle. Danny helped Sheila up, and Sheila left with a male, whom Danny identified two years later as Kenneth O'Guinn. Dianna remembered dancing with O'Guinn that night, and later saw Sheila and O'Guinn leave together.

In the early morning hours of May 24, 1981, Sheila Cupples was brutally raped and murdered. That afternoon, her naked body was found at the end of a dead-end street in a field. Sheila's halter top was wrapped tightly around her neck and a tire iron lay between her outstretched legs; her face had been beaten severely, and her body dragged into the field. Sheila had been sexually penetrated by a blunt metal or wooden object. Investigators interviewed several people who had seen Sheila the night before, but made little progress on the case.

O'Guinn was arrested in Alabama on July 4, 1983, in connection with the investigation of the rape and assault of an Alabama woman. Alabama investigator Duffey informed

O'Guinn of his *Miranda* rights and questioned him about the assault/rape case. Duffey was also interested in O'Guinn's possible involvement in an unsolved Alabama murder, so after O'Guinn gave a statement regarding the assault/rape case, Duffey asked O'Guinn if he had ever killed anyone. O'Guinn contends that he then invoked his right to counsel, while Duffey asserts that O'Guinn never requested a lawyer. Because O'Guinn could not post bond on the assault/rape charge, he remained in jail on that charge.

Due to factual similarities between the unsolved Alabama murder and Sheila's murder, on July 11, Tennessee investigator Blanton went to Alabama to interview O'Guinn. O'Guinn was again given the *Miranda* warnings and questioned about Sheila's death. O'Guinn consented to a polygraph test, which revealed guilty knowledge as to the facts surrounding Sheila's death. When confronted with this, O'Guinn said that his brother, Robert O'Guinn, had said that he (Robert) had killed Sheila. Based upon this information, the Tennessee police decided to pursue further both Kenneth and Robert O'Guinn as suspects in Sheila's murder.

On August 10, Tennessee agent Leach came to Alabama to question O'Guinn, who by this time had counsel appointed by the State of Alabama to represent him in regard to the unsolved Alabama murder case. Leach contacted this attorney and received permission to talk with O'Guinn. Leach advised O'Guinn of his *Miranda* rights before interrogating him.

On August 12, O'Guinn sent word from jail that he wanted to talk with Duffey. Duffey called in Tennessee investigator Leach. Duffey again advised O'Guinn of his *Miranda* rights, and during this interrogation O'Guinn implicated himself in the Alabama murder. Later that day, Leach took Duffey's place as the interrogator, and began to question O'Guinn about the Cupples murder. Leach did not administer any new *Miranda* warnings, relying on the warnings administered earlier in the day by Duffey, and on O'Guinn's acknowledgment that Duffey had advised him of his rights and that he was giving his statement to Leach freely and voluntarily. During this session, O'Guinn

gave the first of several detailed confessions to the murder of Sheila Cupples. Later that same day, O'Guinn gave a handwritten statement, including a detailing of his *Miranda* rights, confessing to the Cupples murder. On August 15, 1983, O'Guinn gave another oral and another handwritten confession to Sheila's murder. All four confessions were admitted at trial. A jury convicted O'Guinn of the first degree murder and aggravated rape of Sheila Cupples. Following the determination of guilt, the same jury was asked to determine, pursuant to Tennessee state law, whether the death penalty should be imposed. The only additional evidence offered by the State in the penalty phase was to show each juror a photograph of Sheila's body as it was found. The viewing of the horrific photograph had a visible effect on the jurors. O'Guinn was sentenced to death for murdering Sheila Cupples.

O'Guinn's trial counsel pursued direct appeal of his conviction and sentence. Both the conviction and sentence were affirmed by the Tennessee Supreme Court, and the United States Supreme Court denied O'Guinn's petition for a writ of certiorari. *See State v. O'Guinn,* 709 S.W.2d 561 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).

In 1987, O'Guinn filed a petition for postconviction relief in state court, and the court appointed Mr. Byrd to pursue this collateral attack on O'Guinn's conviction. After an evidentiary hearing, the court dismissed the petition in 1988, and the Tennessee Court of Criminal Appeals affirmed. *See State v. O'Guinn,* 786 S.W.2d 243 (Tenn.Crim.App. 1989). Permission to appeal was denied by the Tennessee Supreme Court.

In 1989, O'Guinn filed pro se a second petition for post-conviction relief in state court. Counsel was appointed for O'Guinn, and the petition was dismissed without an evidentiary hearing. The Tennessee Court of Criminal Appeals affirmed the dismissal, and in 1990 the Tennessee Supreme Court denied O'Guinn's petition for review.

On October 12, 1990, O'Guinn filed in federal court a petition for a writ of habeas corpus and on August 7, 1992, filed a su-

perseding petition. After holding evidentiary hearings on November 17–19, 1992, and January 20–21, 1993, the federal district court conditionally granted the writ of habeas corpus on two grounds: (1) ineffective assistance of counsel at sentencing in violation of the Sixth Amendment and (2) a *Miranda* violation. *O'Guinn v. Dutton*, 870 F.Supp. 779 (M.D.Tenn.1993). The state appealed, and O'Guinn cross-appealed to a three-judge panel of this court. The panel reversed the district court's conditional grant of the habeas petition on both grounds, and ordered that the petition be denied in its entirety. Subsequently, the ruling of the panel was vacated, and the case was submitted to the full court, sitting *en banc*.

The majority opinion holds that because O'Guinn's petition contains a *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim that was not raised in the state courts, the petition must be dismissed. I will address this issue first.

## II.

### A. Mixed Petition

O'Guinn's petition alleges that the state violated its obligations under *Brady* by removing exculpatory evidence from its files before allowing defense counsel to inspect and copy those files.[1] Petitioner did not raise this *Brady* claim at any time prior to this federal habeas proceeding, and the State argues on that basis that the claim is procedurally defaulted. O'Guinn responds that he was able to discover the claim only after utilizing discovery procedures first available in this federal habeas action. For purposes of the following analysis, I will assume that O'Guinn has not exhausted his *Brady* claim.[2]

The question, therefore, is whether the entire petition should be dismissed as a mixed petition pursuant to *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), in which the Court held that a habeas petition that contains both exhausted and unexhausted claims must be dismissed in its entirety. The Court ruled that for reasons of comity and efficiency there were to be no more piecemeal adjudications of collateral attacks. *Id.* at 518–20, 102 S.Ct. at 1203–04.

Subsequent to *Rose*, in 1987, the Supreme Court decided *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). Citing *Rose v. Lundy*, *Granberry* held that the State's failure to raise nonexhaustion does not invariably waive the defense. *Id.* at 133–34, 107 S.Ct. at 1674–75. Rather, the Supreme Court held, the federal appellate courts must look at each case in which the non-exhaustion defense was not raised before the district court and decide whether the interests of justice and comity require that the habeas petition be dismissed for failure to exhaust, or require that the federal court proceed to consider the merits of the petition. *Id.* at 134, 107 S.Ct. at 1675.

*Granberry* clearly rejected the notion that *Rose v. Lundy* requires that every petition containing an unexhausted claim must be dismissed by the federal court. *Id.* at 133, 107 S.Ct. at 1674–75. Furthermore, *Granberry* recognizes that nonexhaustion is a defense available to the state, which the state may fail to, or elect not to, raise. *Id.* at 134, 107 S.Ct. at 1675. Where the state fails to raise the defense, it is "appropriate for the court of appeals to take a fresh look at the issue," *id.*, and to consider an entire habeas petition, including an unexhausted claim, if the interests of justice and comity require that course of action, particularly where there has been a full hearing in the district court on the unexhausted claim.

---

1. The four groups of documents/statements allegedly contained evidence (1) that Joanie Cupples was involved in the murder of her cousin, Sheila Cupples; (2) that former Jackson police officer Richard Harper was involved in the murder; (3) that Sheila Cupples was killed because she was providing information about the distribution of illegal drugs; and (4) that Robert O'Guinn, petitioner's brother, was involved in the killing.

2. Speaking only for myself, I would note that one of the reasons I concur in Judge Boggs's separate opinion is that if the assumption is correct that O'Guinn had available to him in the state court post-conviction proceedings the investigative and discovery tools which would have yielded the information underlying his *Brady* claim, but failed to utilize those tools, then that claim is exhausted, and no issue of a mixed petition arises.

In this case, there was a full hearing in the district court on the unexhausted claim. The record of the proceedings before the district court includes testimony from numerous witnesses relative to O'Guinn's claims of withheld evidence and records. The superseding petition is accompanied by two bound volumes of documents attached to an affidavit from O'Guinn's state trial counsel. The affidavit compares the contents of the files to which he was given access during the state proceedings to the contents of those files when the district court discovery was conducted. O'Guinn does not claim that there is any further evidence to be presented in support of his Brady claim; rather, he expressly states in his brief on appeal that all of the evidence necessary to determine the merits of that claim is in the record.

Explaining that the history of the exhaustion doctrine supported the Court's decision to take a middle course between the extremes of treating nonexhaustion as an inflexible bar to consideration of the merits of an habeas petition and treating the state's silence on nonexhaustion as a procedural bar precluding the State from first raising the defense on appeal, the Granberry Court quoted Rose v. Lundy:

> In Ex Parte Hawk, [321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944)], this Court reiterated that comity was the basis for the exhaustion doctrine: "it is a principle controlling all habeas corpus petitions to the federal courts, that those courts will interfere with the administration of justice in the state courts only 'in rare cases where exceptional circumstances of peculiar urgency are shown to exist.'"

Granberry, 481 U.S. at 134, 107 S.Ct. at 1675. Here, the State of Tennessee, whose prerogative it is to raise the nonexhaustion defense, has never asked to have this petition dismissed so that the state court can determine the merits of the unexhausted claim. Where the State does not seek to have the principle of comity applied, and in fact seeks to have the petition heard on its merits, the federal habeas court can hardly be said to be "interfer[ing] with the administration of justice in the state courts" when it proceeds to hear the habeas petition. Id.

O'Guinn, on the other hand, has always had the prerogative of first seeking relief on his Brady claim in the state court. Instead, he chose to file this claim first in federal court. Although O'Guinn has in fact also filed yet another state court post-conviction petition, it is a distortion of Granberry's reasoning and the principles of comity and federalism now to dismiss this habeas petition in the name of those principles.

Finally, while the district court's opinion does not address the issue of exhaustion and addresses the Brady claim only in part and only summarily, that opinion does state at the outset that of all of the issues raised in the habeas petition, only two had any merit. As the district court record of these proceedings amply demonstrates, all of the evidence O'Guinn seeks to have considered in support of the Brady claim was before the district court.

To the extent that the district court did address part of the Brady claim on its merits, I would hold that it was not an abuse of discretion for the court to do so. Weaver v. Foltz, 888 F.2d 1097, 1100 (6th Cir.1989) (recognizing that Granberry allows "federal courts to use their sound discretion in deciding the waiver issue and to make exceptions in the application of the mixed petition doctrine of Rose v. Lundy."). And to the extent that the district court did not explicitly address the remaining aspects of the Brady claim, I would hold that the interests of comity and federalism would be better served by this court's addressing them on the merits.

### B. Alleged Brady Materials

O'Guinn argues that the State withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the reasons set forth above, I will review O'Guinn's Brady claim on the merits.

The Supreme Court recently restated the standard for determining Brady violations in Kyles v. Whitley, —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995):

> [E]vidence is material, and constitutional error results from its suppression by the

government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

*Id.* at ——, 115 S.Ct. at 1565 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). The Court then went on to discuss four aspects involved in determining "materiality" under this standard.

First, the Court stated that materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal...." *Id.* at ——, 115 S.Ct. at 1566. Rather, a court looks to see whether in the absence of the undisclosed evidence the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* The Court held that a "reasonable probability" of a different result is shown when the government's suppression of evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

The Court next stated that "materiality" is not a sufficiency-of-the-evidence test. In other words, the defendant does not have to show that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would be insufficient evidence to convict. Instead, the defendant establishes a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at ——, 115 S.Ct. at 1566.

Third, the Court held that once constitutional error is found under *Bagley,* there is no need for further harmless-error review. Fourth, the Court held that *Bagley* materiality is defined "in terms of suppressed evidence considered collectively, not item-by-item." *Id.* at ——, 115 S.Ct. at 1567. Evidence is considered collectively because a constitutional violation does not occur each time the government withholds evidence. Instead, the burden is on the prosecutor to "gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.*

The Court noted, in making its determination of materiality in *Kyles,* that it had "evaluate[d] the tendency and force of the undisclosed evidence item by item." *Id.* at —— n. 10, 115 S.Ct. at 1567 n. 10. The Court then separately evaluated the evidence's "cumulative effect for the purposes of materiality." *Id.* I will follow this method of analysis in the present case.

### 1. Undisclosed Evidence

During its investigation of Sheila's death, the Tennessee Bureau of Investigation ("T.B.I.") and the Jackson, Tennessee, police department took statements from numerous individuals. Although many statements were turned over to O'Guinn, some statements containing information arguably favorable to O'Guinn were not disclosed to him until discovery in this federal habeas proceeding.

#### a. The Spearses' Testimony

First, the prosecution did not disclose sworn statements from Michael and Debbie Spears given to the T.B.I. on November 2, 1981. In his sworn statement, Michael Spears said that when he and Debbie arrived at the Hat & Cane around 12:15 or 12:30 on the night of the murder, he saw a man sitting on the hood of a T–Bird "fussing" with a girl. He described the man as having somewhat long, sandy-colored hair, a mustache, and a beard. He described the girl as blonde, heavyset and wearing a pink flowery top and pink pants. Michael stated that he and Debbie went into the club and when they left at around 12:50 a.m. to 1:10 a.m., the man and the girl were still "fussing." He stated that the man he described was getting into a white, late-model pickup truck with no tailgate. He could not remember whether the girl got into the truck.

Debbie Spears' statement said that when she and Michael left the Hat & Cane at 12:45 a.m. or 1:00 a.m., she saw a boy and girl "having words." She said that the boy was holding the girl and telling her she was going with him one way or the other while she tried to get loose. She described the boy as having shaggy brown hair and a shaggy beard and the girl as having light brown hair and glasses.

No *Brady* violation occurred with respect to these statements. *Brady* "is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir.1994). Thus, no *Brady* violation occurs where "a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or where the evidence is available to defendant from another source." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.) (citations omitted), *cert. denied*, 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 *and* 502 U.S. 885, 112 S.Ct. 240, 116 L.Ed.2d 195 (1991). For instance, in *United States v. Todd*, 920 F.2d 399 (6th Cir.1990), we found no *Brady* violation where the government did not disclose witness statements but the defendant knew that the witness had potentially exculpatory information. *Id.* at 405.

Here, there was no *Brady* violation because Martin, one of O'Guinn's trial counsel, knew the critical facts necessary to discover the information possessed by the Spearses. Martin knew that the Spearses had assisted the police in drawing a composite of the suspect and that this composite resembled Robert O'Guinn. Martin also knew that the Spearses had identified Robert from a photograph and knew that Robert had been a

suspect.[3] This information was the essence of their statements. Had Martin called the Spearses to testify at trial, he could have inquired about the events forming the basis for the Spearses' composite description and their identification of Robert.

Even if there had been a *Brady* violation, it is not likely that the Spearses' testimony would have undermined the testimony of the other witnesses who saw O'Guinn with Sheila. The Spearses testified at the district court habeas hearing, including testimony by proffer. The district court found that their testimony was "completely incredible," and that they had been thoroughly impeached.[4] This finding is not clearly erroneous. Moreover, their proffered testimony regarding their observations the night of the murder differed materially from their earlier sworn statements.

For instance, at the evidentiary hearing, they stated that both knew Sheila before her murder. Michael dated Joanie Cupples, Sheila's cousin. Their earlier statements merely described a woman in pink, and Michael's earlier statement explicitly says that he did not know Sheila. Michael testified at the district court habeas hearing that he arrived at the Hat & Cane between 11:30 p.m. and midnight on the night of the murder, rather than at 12:15 a.m. or 12:30 a.m. The man with Sheila now was taking her

---

**3.** Because Martin had this knowledge, despite O'Guinn's contention, there was no *Brady* violation with respect to the nondisclosure of the sealed Madison County Grand Jury Indictment of Robert O'Guinn, the Order placing it under seal, and a letter from the State District Attorney to the United States Attorney requesting the issuance of an unlawful flight warrant against Robert O'Guinn.

**4.** Michael's testimony was that he and Debbie arrived at a truck stop in Jackson on the morning of January 21, 1985, to testify at O'Guinn's trial. He stated that, upon arriving, he called the district attorney's office and four T.B.I. agents driving unmarked tan Ford cruisers arrived shortly thereafter to take them to court. Michael testified that the T.B.I. agents drove them to the State of Tennessee Supreme Court building and took them to a conference room with a surveillance window located adjacent to a court room where a trial was in progress. According to Michael, around thirty minutes later, a T.B.I. agent told

him that because O'Guinn had confessed on the stand to the murders, his and Debbie's testimony was not needed and they could leave. Michael concluded his testimony by saying that he feared for his safety because a woman claiming to be an F.B.I. agent, who in fact was not connected with the F.B.I. or T.B.I., had recently contacted him about the case. Debbie gave similar testimony at the hearing.

Testimony put on by the State revealed discrepancies in almost every aspect of the Spearses' testimony. The prosecutor at O'Guinn's trial testified that he had sent one T.B.I. agent to a truck stop to pick up the Spearses, but the T.B.I. agent's vehicle slid off the road because of ice and the Spearses never appeared at trial. Witnesses for the State testified that trials were not held in the Supreme Court building and that there was nothing which could be reasonably characterized as a conference or surveillance room in the Madison County Courthouse. Lastly, two State witnesses testified that the T.B.I. did not use tan Fords at that time.

towards a blue van instead of a white pickup truck. Debbie likewise had not mentioned the blue van earlier. Finally, in contrast to his earlier testimony, Michael testified that by the time he left the club, Sheila and the man were gone. Because the Spearses' testimony could be discredited so easily, it is unlikely that it would have exculpated O'Guinn had it been offered at his trial.

### b. *Statements Suggesting Others Were Involved*

The undisclosed information contained statements from witnesses which, according to O'Guinn, implicate others in Sheila's murder. Several people gave statements to the T.B.I. that on the weekend before the murder Joanie Cupples had an argument with Sheila's mother and father in front of the Hat & Cane about Sheila's whereabouts because Sheila was underage. Sheila arrived during the argument. One eyewitness stated that Joanie pulled a knife on Sheila's mother, but another stated that Joanie threatened to cut Sheila with the knife. One person stated that Joanie yelled, "I'll kill you," as Sheila and her parents drove away. Handwritten notes from Jackson police said that about 1:15 a.m. or 1:30 a.m. on the night of the murder, a man saw Joanie sitting in her car in the Hat & Cane parking lot looking sick and "shaking like a dog."

Renee Dees told the T.B.I. that in September 1981, someone at a party (she thought probably Joanie, but Dees had been too intoxicated at the time to be sure) had told her 1) that an unidentified person had put an unidentified drug in Sheila Cupples's coke the night of the murder, 2) that Sheila had been drinking nothing but coke that night, 3) that unidentified persons had taken Sheila into a blue van in the parking lot of the Hat & Cane, 4) that the van hit a car in the parking lot as it was leaving,[5] 5) that the van went to a motel where Sheila's aunt Dorothy Cupples (Joannie's mother), Alice Cox Stewart and Joanie were in a room, and all of them were nude, and 6) that Sheila tried to leave the room but the person who brought her to the motel would not let her leave. The T.B.I. report of the Dees statement indicates that Dees also told the T.B.I. that, at the same party, Joanie had told Dees's cousin a different story about the night of the murder.

Additionally, Johnnie Howard told the T.B.I. that Sheila and Stewart had been arguing the night of Sheila's death. William Dix told the T.B.I. that he and Stewart went to the Hat & Cane that night in Dix's blue van. The Jackson police had a lead that Sheila was seen ready to leave with Dix on that night.

Dell Ehrett told the T.B.I. that he left the Hat & Cane with a "Debbie" he had just met around 1:00 a.m. to 7:30 a.m. the night of the murder and that he went to "Debbie's" trailer. This woman was later determined to be Diana Scott, who stated that she had not left with Ehrett but had waited in her trailer until he arrived at around 2:30 a.m. to 3:00 a.m.

To the extent that this information contained leads, they appear to have been followed up by the investigators. To the extent that the information could have been produced in an admissible form at trial, it is not likely that it would have had any effect on the jury. Most of the evidence about Joanie's threats indicates that they were directed towards Sheila's mother, with whom she was fighting. Joanie testified at trial that she drank beer and whiskey, and took two Valium and four Darvon pills the night of the murder, a likely cause of her sickness. No other credible evidence implicates Joanie in any respect. Dees could not be certain of the source of the information she heard and it is not believable in any event. Finally, there is no evidence that anyone actually saw Sheila leave the Hat & Cane with Dix or Ehrett.

### c. *Evidence Implicating Richard Harper*

The T.B.I. had information, which it did not disclose at the time of O'Guinn's trial, indicating that Richard Harper, a former Jackson police officer, was worried that he might have killed Sheila since he had been too drunk to remember what he had done the night of her murder. This information has

---

5.  Police notes did corroborate the fact that a van hit a car at around 1:00 a.m. on that night.

little, if any, weight in exculpating O'Guinn. Several persons, including Harper's roommate, told the T.B.I. that Harper had arrived home around the time that Sheila disappeared from the Hat & Cane. The T.B.I. also had information that Harper was mentally unstable. No evidence whatsoever links Harper to the murder other than his own fears about what he might have done while drinking.

#### d. *Statement of Wanda Sanders*

One statement proffered by O'Guinn as exculpatory is completely unworthy of credence. Wanda Sanders told the T.B.I. that several hours before Sheila died, Sanders was in bed and heard "voices" threatening to kill Sheila for "narking." Sanders later told the police that she had not heard "voices" but instead had merely put together facts she had heard on the street in an attempt to aid the investigation. The police admonished her to refrain from such "aid." Clearly, this statement could in no way affect the State's case against O'Guinn.[6]

### 2. *Analysis under Kyles*

Viewed as a whole, the undisclosed evidence in this case was not "material" under the *Kyles* standard. In *Kyles*, the Court found constitutional error because the undisclosed evidence significantly weakened the prosecution's case, both with respect to eyewitnesses and the physical evidence. — U.S. at — – —, 115 S.Ct. at 1574–75. Here, the strongest evidence against O'Guinn was his detailed confessions. Even considered collectively, the withheld information is not strong enough to undercut the damning effect of these confessions.[7] I cannot say that the evidence "could reasonably be taken to put the whole case in ... a different light" such that confidence in the verdict is undermined, *id.* at —, 115 S.Ct. at 1566, and thus I would find no *Brady* violation.

---

**6.** There is one other reference to "narking" that O'Guinn contends is exculpatory. Rickey Erwin told the T.B.I. that he was told a man from Henderson, Tennessee had Sheila killed for "narking" on him. Testimony by Erwin about this statement would be inadmissible and no other evidence supports this explanation for her death.

### III.

As I indicated at the outset of this dissent, I address the remaining issues raised in O'Guinn's appeal only because the separate concurring opinion undertakes to instruct on those issues and I do not believe that that opinion is accurate in its statements relative to the facts or the law.

#### A. *Miranda Warnings*

O'Guinn claims that while he was incarcerated in Alabama, he was given inaccurate information relative to his right to counsel. O'Guinn does not contend that he requested counsel during any of the interrogation sessions after July 4. Rather, he claims that he would have done so but for a statement allegedly made on July 4 by Alabama investigator Duffey that O'Guinn could not be provided counsel until he went to court.

The district court held, and the separate concurring opinion filed by Judge Merritt agrees, that O'Guinn had been misinformed about the nature of his right to counsel and that the waiver of his right to have counsel present during questioning was therefore not knowing and intelligent. For the reasons that follow, I believe that the district court and the concurring opinion are in error.

#### 1. *Standard of Review*

"The preliminary or threshold standard by which we review the district court's [habeas] judgment is *de novo*, but with complete deference to evidence-supported state court findings of fact." *Lundy v. Campbell*, 888 F.2d 467, 469 (6th Cir.1989), *cert. denied*, 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). Factual findings made by a state court after a hearing and evidenced by a writing "shall be presumed to be correct," unless the petitioner can meet one of the eight conditions spelled out in 28 U.S.C.

---

**7.** For the reasons which I enumerate in section III. B of this dissent, I do not believe that O'Guinn's confessions can reasonably be said to be either coached or unreliable as the separate concurring opinion characterizes them. To the contrary, they are chilling in their accuracy in regard to many of the facts material to the murder.

§ 2254(d)(1)–(8). *See* 28 U.S.C. § 2254(d) (1994).

Section 2254(d)(8) plainly states that the state court findings are presumed correct unless they are not fairly supported by "the record of the State court proceeding in which the determination of such factual issue was made." This is repeated in the flush language of § 2254(d): "the record in the State court proceeding." Thus, § 2254(d)(8) permits a federal court to overcome the presumption of factual correctness that attaches to state court determinations only if the federal court concludes, after reviewing ("as a whole") "the record of the State court proceeding in which the determination of [the disputed] factual issue was made," that the factual determination is not "fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994). This statute does not permit a federal habeas court to use evidence *dehors* the record of the state court proceeding to reach the conclusion that the state court's factual findings are not fairly supported by that record.

In order to provide an adequate basis for appellate review, the Supreme Court has said that a federal district court must provide a written justification for not deferring to the facts as found by the state court.

> [W]e now hold that a habeas court should include in its opinion granting the writ the reasoning which led it to conclude that any of the first seven factors were present, or the reasoning which led it to conclude that the state finding was "not fairly supported by the record."

*Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).

Finally, although we review for clear error the findings of fact made by a district court after its own evidentiary hearing, when we review the court's interpretation of historical facts (*e.g.,* those found in the state record) we conduct an independent review. *See Miller v. Fenton,* 474 U.S. 104, 111–12, 106 S.Ct.

445, 450–51, 88 L.Ed.2d 405 (1985); *Self v. Collins,* 973 F.2d 1198, 1203–04, 1220 (5th Cir.1992), *cert. denied,* 507 U.S. 996, 113 S.Ct. 1613, 123 L.Ed.2d 173 (1993); 2 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 1306 (1992) ("[I]f the federal district court decides the habeas issues without an evidentiary hearing, then there are no fact findings by that court, and on appeal, the circuit court effectively occupies the same place as the federal district court and reviews the state court proceedings in the same way."). To illustrate, at the evidentiary hearing in the district court, O'Guinn called as a witness Michael Spears, who testified about O'Guinn's claims that the state secreted Michael and Debbie Spears during trial and then represented to the jury that the Spearses would have testified for the state but were unable to attend the trial because of the weather. This court does review under the clearly erroneous standard the district court's finding that Michael Spears's testimony at that hearing was "completely incredible." The same would be true for all the other issues on which the district court held an evidentiary hearing and for which there is no state court finding. But on the *Miranda* issue, the district court did not take testimony; rather, it relied on historical facts as set out in the two suppression hearing transcripts.[8]

### 2. State Court Factual Findings

The issue of the admissibility of O'Guinn's confessions has been considered several times by the Tennessee courts. O'Guinn's trial counsel filed a pretrial motion to suppress O'Guinn's four confessions to Sheila's murder, and both O'Guinn and Alabama investigator Duffey testified at the hearing on that motion. O'Guinn testified on direct examination as follows:

> Q.  And did Investigator Duffey explain your rights to you?
>
> A.  Yes, sir, at that time.

---

8.  The district court acted properly in *not* taking testimony from O'Guinn and Duffey on this issue. Where there is a factual basis in the state court record to decide an issue, the district court may not conduct its own mini-trial in order to find new facts and overrule the findings of the state court. *See* 28 U.S.C. § 2254(d) (1994); *Meeks v.*

*Singletary,* 963 F.2d 316, 319 (11th Cir.1992), *cert. denied,* 507 U.S. 950, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993); *Ellis v. Collins,* 956 F.2d 76, 78 (5th Cir.) ("Federal courts do not retry facts already found by state courts."), *cert. denied,* 503 U.S. 915, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992).

Q. And what was your response to his explanation?

A. I went ahead and give my statement on the charge [the Alabama charge of assault and rape], and then he started talking about a murder charge, and I said, "Wait a minute now. I volunteered to give you a statement on the assault charge, but on this murder charge, I know I'm going to need a lawyer, so I'd like to have one." He said, "Well you won't be able to get a lawyer until you go to court."

Q. Now when was that?

A. That was on July the 4th of '83.[9]

Investigator Duffey testified on cross examination as follows:

Q. Now, did there come a time—Do you remember the first time when you raised in your interview or interrogation of Mr. O'Guinn the possibility of committing a murder, either in Alabama or Tennessee?

A. July the 4th.

Q. Is that the time that we have reports that indicate you arrested him for a rape and assault and you brought that up because you had this unsolved murder, and Mr. O'Guinn broke down and cried? Is that the occasion?

A. Yes, sir.

Q. Now can you remember the second time that you discussed murder with Mr. O'Guinn, whether it be Alabama or Tennessee?

A. I imagine it was the next time I talked to him.

Q. And would that have been within the week?

A. Yes, sir.

Q. Now, is it a fair statement that throughout the course of your examination, and therefore you [sic] interrogations with Mr. O'Guinn, you were always attempting to discuss the prospect of murder?

A. Yes, sir.

Q. Now isn't it true at a certain point in time that Mr. O'Guinn had indicated to you that if you were going to continue to discuss murder that he better have his lawyer?

A. *No, sir, not to my knowledge.*

Q. Now it is correct that there was a hearing in Huntsville, Alabama before Judge Page regarding the Mueller [sic] murder down there.

A. Yes, sir.

Q. And in fact, it again was a suppression hearing; was it not?

A. Yes, sir.

Q. Now, I'm going to ask you—show you a document first I suppose. I'll ask you if you can recall in that hearing that you made the statement that Mr. O'Guinn did say that·or could have said that?

A. No, sir, I don't remember saying that in the motion to suppress evidence down there. I was asked did he request an attorney and I told him not to my knowledge because in the interview on August the 12th of 1983, Kenneth Wayne O'Guinn was advised of his rights by me on tape, and he answered that he understood his rights. *At no time to my knowledge did Kenneth Wayne ask for an attorney.*

**[intervening colloquy]**

On August the 12th when he made the statement pertaining to this, it was placed on tape, and *at no time to my knowledge did he ever ask for an attorney.*

Trial Record (Motions Hearing Jan. 3, 1985), vol. I of IV, p. 31 (emphasis added). The

---

9. This testimony is discussed in the Tennessee Supreme Court's opinion. *See State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).

O'Guinn testified similarly at the evidentiary hearing on his first state post-conviction petition:

O'Guinn: [The officers] started talking about a murder case and I said, "Wait a minute. If you're going to talk about a murder case, I'd like to have a lawyer."

Attorney: All right. And what, if anything, did Mr. Duffey tell you at that point?

O'Guinn: At that point he told me I'd have to go to court to get an attorney, but he just got off the subject and quit talking about the murder case.

state trial court denied the motion to suppress, apparently disbelieving O'Guinn's testimony that he requested an attorney and believing Duffey when he said O'Guinn did not request an attorney. After his conviction, O'Guinn appealed his sentence and argued before the Tennessee Supreme Court that his motion to suppress his confessions should have been granted. The Tennessee Supreme Court reviewed the transcript and found portions of it that clearly supported the denial of the motion. The court cited all three of the italicized statements above in support of its finding, *see State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986), and concluded that while the trial court did not render detailed findings of fact on the issue, it was "[i]mplicit in the trial court's findings ... that investigator Duffey never misrepresented defendant's right to counsel. The trial court's denial of the motion to suppress resolves the credibility issues against the defendant." *Id.*[10]

### 3. The District Court's Factual Findings

Despite the state courts' resolution of this issue, the district court concluded that O'Guinn had in fact asked for counsel. In my view, the district court committed two distinct errors in doing so. First, in reaching this conclusion, the district court considered testimony from an Alabama suppression hearing which was not introduced into evidence in the Tennessee proceedings at any time, and was therefore not part of the record in the state court. And second, even if the district court had been within its discretion to consider that evidence, the court did not have discretion to reject the state court's findings of fact because the district court was able to construct an alternative and plausible factual scenario.

The testimony the district court impermissibly considered arose in the context of the State of Alabama's prosecution of O'Guinn for the murder of Linda Muller, a crime which was unsolved at the time O'Guinn was arrested on the Alabama assault and rape charges. During the course of his interroga-

tions by Duffey, O'Guinn confessed to murdering Muller as well, and prior to trial in Alabama, he filed a motion to suppress that confession for the same reason he forwards in this court. At the *Alabama* suppression hearing, which occurred before the Tennessee suppression hearing, O'Guinn testified that he had asked for counsel during that July 4 interrogation and that Duffey had advised him that he would get a lawyer when he went to court. Duffey's testimony at that hearing on the question of O'Guinn's request for counsel during his interrogation was somewhat equivocal:

Q: Did [O'Guinn] not express to you, after you had advised him of his rights, or at the time you advised him, that because it was murder he felt he was going to need a lawyer?

A: He could have, I don't remember it, but he could have.

   . . . .

Q: Is that not what you told Mr. O'Guinn on this occasion that yes, they would give him a lawyer when he got to court?

A: I may have told him that if he went to court that the courts would appoint him one.

*State v. O'Guinn,* 462 So.2d 1052, 1053 (Ala. Crim.App.1985).

The Tennessee Supreme Court had held that the state trial court had resolved against O'Guinn the question of O'Guinn's credibility. The district court determined that the Tennessee Supreme Court must, therefore, have presumed that the state trial court had found that O'Guinn's testimony concerning his request for counsel contradicted the State's evidence that O'Guinn did not request counsel. The district court expressly disagreed with that presumption because "[c]onsidering the record as a whole, the Tennessee suppression transcript is ambiguous on this point." *O'Guinn v. Dutton,* 870 F.Supp. 779, 783 (M.D.Tenn.1993). The district court went on to analyze the questions asked of Duffey and his answers during both the Alabama suppression hearing and the Tennessee

---

10. O'Guinn again raised this issue in his first petition for post-conviction relief. His contention was denied by both the Tennessee Criminal Court and the Tennessee Court of Criminal Appeals. *See State v. O'Guinn,* 786 S.W.2d 243, 244–46 (Tenn.Crim.App.1989).

suppression hearing regarding what Duffey said to O'Guinn about his right to counsel. The district court concluded:

> The only reasonable conclusion, then, is that Duffey testified truthfully at the Tennessee hearing, but that he misunderstood the lawyer's question to refer only to whether O'Guinn requested counsel on [August] 12th. Consequently, the testimony at the Tennessee suppression hearing was not in conflict, and because there was no conflicting testimony, this court cannot agree that the trial court necessarily resolved O'Guinn's credibility against him.

*Id.* at 784.

Finally, the district court held that "[e]ven if the trial court did make the factual determination that the testimony was in conflict, since the Alabama suppression transcript was not a part of the state record, this court finds pursuant to the last paragraph of 28 USC § 2254(d) that such a finding would be clearly erroneous." [11] *Id.* at 784 n. 10.

In a nutshell, the district court decided that the Tennessee trial court could not be said to have resolved any credibility determinations against O'Guinn unless O'Guinn's testimony contradicted Duffey's. The district court then decided that there was no contradiction because Duffey's Tennessee testimony referred only to the August 12 interrogation and not to the July 4th session, and therefore, both Duffey and O'Guinn were telling the truth. So, the district court concluded, the state trial court had no credibility determinations to make and the Tennessee Supreme Court was wrong when it held that the trial court had resolved credibility issues against O'Guinn. The district court found that because O'Guinn's testimony at the Alabama suppression hearing was uncontradicted, O'Guinn had in fact asked for counsel on July 4, had been misinformed about its availability, and had relied on the misinformation. Further, the district court concluded that if the state court had determined that in light of his Alabama testimony, Duffey's Tennessee testimony referred to both the July 4th

and the August 12th interrogations, and was therefore in conflict with O'Guinn's, such a finding was clearly erroneous because the Alabama testimony was not properly before the Tennessee trial court. Thus did the district court use the same *Alabama* testimony that it held was not properly before the state court and that the state court was not permitted to use because it was not properly before that court, to conclude that the state court's findings of fact were not fairly supported by the state court record.

Under 28 U.S.C. § 2254, a state court's factual findings are generally presumed to be correct. The district court erred by considering, in interpreting Duffey's Tennessee testimony, his Alabama testimony, which was never introduced as evidence in the Tennessee hearing. The district court was not, therefore, permitted to use the Alabama transcript in deciding that the Tennessee finding was not fairly supported by the Tennessee record. If there was any inconsistency between Duffey's testimony in Alabama and his testimony in Tennessee, it was up to O'Guinn's Tennessee counsel to draw this out when cross-examining Duffey in Tennessee. This is exactly what O'Guinn's counsel did, *see supra* section III.A.2, although not to the extent of reading Duffey's Alabama testimony into the record or offering the Alabama transcript as evidence in the Tennessee suppression hearing.

Common sense, of course, tempts us to consider all available evidence in resolving factual disputes, because most people would believe that the question "What really happened in the Duffey–O'Guinn conversation?" cannot have more than one correct answer. But factual correctness in a metaphysical sense is not properly our concern here; the limit of our federal habeas review authority is to determine whether the procedures by which the state court took evidence conformed to federal constitutional standards, and after that, only whether the factual findings are fairly supported by the record before that court.[12] O'Guinn does not claim

---

11. This is the closest the district court came to making the required written statement about which of the § 2254(d) exceptions applied and why.

12. This would not be the case if the issue were O'Guinn's actual innocence of the crime, for then due process concerns would permit a petitioner to present evidence from any source whatsoever

that the procedure for taking testimony was fundamentally unfair, and there is no evidence to suggest it was. The district court's only task, then, was to determine whether the Tennessee record as a whole fairly supported the factual conclusion of the Tennessee state courts.

In making its finding, the district court relied almost exclusively on the conflict it perceived between Duffey's Alabama and Tennessee testimony, and as to the Tennessee suppression transcript, the district court found only that it was "ambiguous" as to whether Duffey testified that O'Guinn never requested a lawyer in July. Duffey never expressly said during the Tennessee suppression hearing, "O'Guinn did not request a lawyer on July 4th." But when Duffey answered "No, sir, not to my knowledge," he was answering a question that gave as its scope "a certain point in time" and that had been immediately preceded by a discussion of the events of July 4th and the following week. No mention of the events of August led up to this question. Duffey's testimony later in that cross-examination that O'Guinn did not request a lawyer in August does not contradict the state courts' finding that O'Guinn did not request a lawyer in July. Because Duffey's testimony at the Tennessee suppression hearing is internally consistent, there is no basis for concluding that the trial court's decision is unsupported by the record. We are therefore bound by the state court's finding that Duffey did not misrepresent O'Guinn's rights to him.

We must assume that in ruling on O'Guinn's motion to suppress, the state courts applied the correct standards of federal law, and we must interpret the state trial court's denial of the motion to suppress as an indicator of its understanding of the testimony. *See LaVallee v. Delle Rose*, 410 U.S. 690, 694–95, 93 S.Ct. 1203, 1205–06, 35 L.Ed.2d 637 (1973); *see also Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (reversing this circuit for failing to accord the state court's conclusions the requisite high measure of deference). It

is not necessarily objectionable that the state trial court's findings were only "implicit." *See Marshall*, 459 U.S. at 433, 103 S.Ct. at 850; *Delle Rose*, 410 U.S. at 692, 695, 93 S.Ct. at 1204, 1206. It is the place of the trial court to interpret the meaning of a witness's testimony in light of his demeanor. *See Amadeo v. Zant*, 486 U.S. 214, 227, 108 S.Ct. 1771, 1779, 100 L.Ed.2d 249 (1988); *Patton v. Yount*, 467 U.S. 1025, 1038 & n. 14, 104 S.Ct. 2885, 2892 & n. 14, 81 L.Ed.2d 847 (1984) (considering answers given by prospective jurors during voir dire). A trial judge may properly conclude that a witness means one particular thing, even when his testimony is "ambiguous and at times contradictory." *Yount*, 467 U.S. at 1039–40, 104 S.Ct. at 2893 (holding that the federal court of appeals on habeas review erred in rejecting state trial judge's finding that certain prospective jurors could render an impartial decision); *see also Amadeo*, 486 U.S. at 227, 108 S.Ct. at 1779. Finally, where the findings of fact by the state court find support in the record, those findings must control, notwithstanding federal habeas court findings that might also find support in the record. *See Wainwright v. Goode*, 464 U.S. 78, 85, 104 S.Ct. 378, 382–83, 78 L.Ed.2d 187 (1983) (holding that if two different conclusions find fair support in the record, a federal court may not substitute its view of the facts for that of the state court); *Lonberger*, 459 U.S. at 430–38, 103 S.Ct. at 848–53.

Furthermore, even if we rejected the High Court's order to heed the implicit finding of the state trial court, we still owe deference to the inarguably *explicit* finding of the Tennessee Supreme Court on this issue. *See Goode*, 464 U.S. at 85, 104 S.Ct. at 382–83; *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

In conclusion, I do not say that the district court's findings of fact *could* not be an accurate description of what really happened here. The district court makes a plausible argument that the testimony at the suppression hearing (or even hearings) does not *necessarily* dictate the conclusion reached by

which established that he did not commit the crime for which he was convicted. Unlike Judge Merritt, however, I do not believe that the record

in this case can be read to raise an issue of actual innocence.

the state courts and that the facts could have been otherwise. But given the testimony presented before the Tennessee state trial court, I do not believe that we can say that the finding that O'Guinn did not request counsel is not fairly supported by the record; neither could the district court properly say so. The federal habeas court must therefore accept that finding. The district court's conclusion that Duffey misunderstood the question posed to him and the court's creation of another plausible view of the evidence are simply not permissible. Section 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Lonberger*, 459 U.S. at 434, 103 S.Ct. at 851.

#### 4. Was the Warning Given by Duffey Constitutionally Inadequate?

Even if we were to assume that Duffey did incorrectly tell O'Guinn that he would not be able to get a lawyer until he went to court, one of the questions the district court and the separate concurring opinion fail to address is whether this misinformation was sufficient to render the warnings inadequate and O'Guinn's later waiver of rights invalid. I believe that Duffey's explanation of when O'Guinn would receive a lawyer if he requested one adequately expressed the *Miranda* rights. *See Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (holding that Advice of Rights form that contained the language "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court" was not constitutionally defective and adequately apprised the suspect of his *Miranda* rights, in light of other warnings contained in form). O'Guinn concedes that he was informed of his *Miranda* rights, and although the record does not contain the exact language Duffey used to inform O'Guinn of his rights, there is no suggestion

that the warning did not contain the standard language about the right to have a lawyer present during questioning. Therefore, even if I were to agree that the findings of the district court in this regard were proper, I would not agree that the district court was correct in holding that the writ should be granted. Rather, I would hold that this case should be remanded for consideration in light of *Duckworth v. Eagan*.[13]

Finally, even assuming that O'Guinn was given an inadequate explanation of his *Miranda* rights, another question arises: Did such a misrepresentation carry through to and taint O'Guinn's confessions to the Tennessee murder?

It must be remembered that the *Miranda* warnings themselves are not required by the Constitution, and that an inadequate warning is not a constitutional violation *per se*. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *Duckworth*, 492 U.S. at 209, 109 S.Ct. at 2883–84 (O'Connor, J., concurring); *Oregon v. Elstad*, 470 U.S. 298, 306–10, 105 S.Ct. 1285, 1291–93, 84 L.Ed.2d 222 (1985). The constitutional question is whether O'Guinn was "compelled" to be a witness against himself, meaning that in order to be admissible, O'Guinn's confession(s) must have been voluntary. So we must consider whether Duffey's statement to O'Guinn in regard to the Alabama murder investigation—that O'Guinn could get a lawyer only if he went to court—rendered O'Guinn's four later confessions to a different crime, made to a different interrogator, and accompanied by full *Miranda* warnings by that interrogator,[14] compelled him within the meaning of the Fifth Amendment. I would hold that it did not. *See United States v. Daniel*, 932 F.2d 517 (6th Cir.) (holding that even assuming a first confession was given involuntarily because of promise of leniency to defendant's girlfriend, second confession was voluntary and admissi-

---

13. The Alabama trial court suppressed O'Guinn's confession to the Muller murder on the basis of Duffey's statement regarding when O'Guinn could receive a lawyer, and the state appeals court affirmed. *See State v. O'Guinn*, 462 So.2d 1052 (Ala.Crim.App.1985). The Alabama court's ruling on the admissibility of O'Guinn's confession preceded *Duckworth v. Eagan*. Under the current state of the law, a similar ruling could be incorrect.

14. The first confession to Leach, of course, was not accompanied by a *Miranda* warning administered by Leach. This issue is addressed in the next subpart of this opinion.

ble), *cert. denied,* 502 U.S. 890, 112 S.Ct. 252, 116 L.Ed.2d 206 (1991).

### 5. The *Oregon v. Elstad* Issue

One final question remains on the confessions issue: whether Leach's failure to readvise O'Guinn of his *Miranda* rights, after Duffey had given O'Guinn *Miranda* warnings earlier in the day, rendered O'Guinn's first confession to the Cupples murder inadmissible or tainted the following confessions, or both. Even though O'Guinn has not argued that his first confession was inadmissible because Leach failed to repeat the warnings given to him earlier, the State has conceded that the first confession was inadmissible (because it was unaccompanied by a *Miranda* warning given by Leach, not because it was tainted by Duffey's alleged misinformation to O'Guinn) and has simply argued that its admission was harmless error. I therefore address this issue briefly.

This issue is controlled by *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the respondent had given a first incriminating statement without *Miranda* warnings, under circumstances in which the State conceded the warnings were required. *Id.* at 302, 105 S.Ct. at 1289. The police later advised the respondent of his *Miranda* rights and secured a second confession. The state court held that because of the brief period between the two confessions, the "cat was sufficiently out of the bag to exert a coercive impact" on the respondent's second confession and to render it inadmissible. *Id.* at 303, 105 S.Ct. at 1290. Reversing, the Supreme Court held that the second confession was not rendered inadmissible; it rejected the "cat out of the bag" theory, and finding that the first statement, although unwarned, was voluntary, held the second statement properly admitted. *Id.* at 318, 105 S.Ct. at 1297–98.

There is little basis for distinguishing O'Guinn's case from that of *Elstad.* In fact, the case for the admissibility of O'Guinn's first confession is made stronger because of the prior warnings given to O'Guinn by both

Duffey (in July and August) and Leach (in July). Therefore, I would hold that the Mirandized confessions that followed O'Guinn's first confession to the Cupples murder were voluntary and untainted by the first confession.

### B. The Confessions

The separate concurring opinion characterizes O'Guinn's four confessions as "lack[ing] reliability even on a cursory reading because O'Guinn's statements, when not heavily coached by the police, were completely inconsistent with the facts known to the police about the murder." Further, the opinion indicates that these confessions are suspect because O'Guinn was experiencing "excruciating pain from numerous tooth extractions," and his physical state alone at the time he gave the confessions makes them questionable.

Although O'Guinn in his cross-appeal claims that his confessions were coerced by investigators while he was mentally and physically infirm, he never alleged as a basis for suppression of his statements that he was under any physical or mental coercion, such an argument has never been addressed by the state courts, and he presents no new evidence in these habeas proceedings to support such a claim. And the separate concurring opinion's characterizations of the confessions are not supported by the record. O'Guinn himself, testifying at the state court hearing on his motion to suppress his confessions, made the strongest statement about his condition at the time he made those confessions. Asked why he had confessed to the Tennessee murder if his confession was not true, O'Guinn said "I was in the process of getting my teeth pulled. I was getting nothing for the pain." Asked if he had been able to eat sandwiches at that time, he said, "Yes, sir, considering the type sandwich, a ham sandwich with mayonnaise." And he agreed that the agents had taken breaks, during which time they had brought him coffee and cigarettes.[15]

---

**15.** It is interesting to note, however, that some nine months earlier, in the pretrial motion proceedings in the *Alabama* state court, where

O'Guinn was charged with the murder of an Alabama woman, O'Guinn was asked very similar questions about why he had given confessions

There is nothing in the voluminous record in this case to support the separate concurring opinion's claim that O'Guinn's mental condition or his physical condition, or the two in combination, were such as to render his detailed confessions suspect or unreliable. Nor does the record support the claim that those confessions were simply a regurgitation of details of the murder supplied to O'Guinn during the course of his interrogation. There is no question that there are inconsistencies between the evidence gathered by the police and confessions given by O'Guinn. The confessions, after all, were given more than two years after the Cupples murder was committed and well after the similar Muller murder, to which O'Guinn confessed at the same time. There is no question that O'Guinn did not forthrightly confess to having mutilated Sheila Cupples's body with a tire iron. Neither did he forthrightly deny it. However, there is simply no support in the record for the statements contained in the separate concurring opinion that "O'Guinn's statements never 'matched' what the authorities wanted him to say until the police prompted or led him," and that "O'Guinn had been questioned and coached about the Cupples murder for weeks and had obtained quite a bit of knowledge from the police about the murder."

More importantly, it is simply not true that O'Guinn's confessions are, as the concurring opinion says, "stated in only the broadest terms" and that any details were provided only after coaching from the police. A few examples will suffice.

O'Guinn told the investigators that he always carried a tire iron in his car because the lock mechanism for the trunk was gone, and he used the tire iron to open the trunk. O'Guinn said that he had put Sheila's body in the trunk of his car, and that "my trunk, I had alot of stuff in it. Matter of fact, I had to sit on the trunk to get it shut with her in there." And he said, he had used the tire iron to open the trunk to take the body out and he was not sure what he had then done with the tire iron. None of this information

was provided in response to leading questions, because none of it was anything that the investigators could have known, but the details about O'Guinn's trunk were corroborated approximately ten days later by Robert O'Guinn when he was interviewed for the first time about the Cupples murder. Robert O'Guinn told the investigators that Kenneth's trunk had no lock and had to be opened using something such as a screwdriver, that he did not know whether Kenneth used a tire iron for that purpose but that a tire iron would have worked, and that Kenneth kept his trunk full of a lot of "stuff" which Robert described as clothes, tires, tools and other "junk."

When asked by the investigators, "Let me ask you this, Kenneth, did you give her any drugs? Did she take any while she was with you?" O'Guinn replied that Sheila had given him drugs. He told the investigators that Sheila had given others at the bar what he described, without any coaching or prompting, as "gray and black capsules" which he believed to be Darvon. O'Guinn specifically recalled that Sheila had laid some of the capsules on the table at the Hat & Cane, and that he had taken some after he picked up her glasses from the floor. Earlier in the questioning, in response to the question "Did she have glasses or not?" O'Guinn had told the investigators that he knew that Sheila wore glasses because at the bar, Sheila had dropped them and he had picked them up and handed them to her. During the questioning, O'Guinn identified a photograph of Sheila's glasses. Witnesses at trial, among them Joanie Cupples, testified that Sheila had taken Darvon the night of the murder, and had given black capsules to others at the bar.

Most telling is the fact, not mentioned in the separate concurring opinion, that O'Guinn drew a map of the location in which he said he had left the body. When asked by Investigator Leach whether he could draw such a map, O'Guinn responded that he already had done so, that he wasn't sure how

---

to the Alabama murder *on the very same days that he confessed to the Cupples murder,* if those confessions were not true. There, O'Guinn said that he confessed because he was tired of being

questioned and wanted to be left alone. He made no mention whatsoever of teeth, pain, inability to eat, or any other infirmity, either physical or mental.

good it was, and that he had not showed it to Investigator Duffey. In one of his confessions, O'Guinn described the location as being near the intersection of I–40 and the I–45 Bypass and not more than five minutes by car from the intersection. He further said that there were motels and restaurants in the area of the intersection and that he could see the Bypass from the place where he left the body. In fact, the map (attached hereto as Appendix A) was very good, as a comparison of it to the highway map of Jackson (attached hereto as Appendix B) makes clear. The body of Sheila Cupples was found at the dead end of Conrad Drive, a stone's throw from the Bypass, and about a mile and a half south of the intersection of I–40 and the I–45 Bypass.

Finally, the investigators asked O'Guinn whether he had "save[d] anything as a remember of this," and specifically whether he had seen any newspaper clippings or articles about the murder. O'Guinn responded that he had seen nothing, that he had heard nothing of the murder on the news, and that the Huntsville paper, the only paper he read, had not mentioned the murder.

O'Guinn's confessions were not obtained in violation of his rights under the Constitution, and any claim that they were coerced was procedurally defaulted, and its merits may not properly be reviewed in these habeas proceedings. The confessions are neither suspect nor unreliable. And they were believed by the jury, whose prerogative it was to judge their credibility.

## C. Ineffective Assistance of Counsel at the Sentencing Phase of Trial

In his federal habeas petition O'Guinn argued, the district court held and the separate concurring opinion agrees, that his trial counsel's performance at the sentencing phase of his trial fell below the standards of effective-

ness required by the Sixth Amendment. The State contends that O'Guinn has waived this argument by not asserting it earlier and that, in any event, the argument is meritless. For the reasons that follow, I think that the district court and the separate concurrence are in error.

The threshold issue is that of procedural default. O'Guinn did not assert an ineffective assistance claim at trial, on direct appeal of his conviction to the Tennessee Supreme Court, or in his first post-conviction petition for relief.[16] It was his second post-conviction petition, filed pro se, which—for the first time—attacked the effectiveness of his trial (and direct appeal) counsel, as well as his appointed counsel on the first post-conviction petition. The state court denied his second petition, stating that O'Guinn's claims had all been either " 'waived' or 'previously determined' " under Tennessee law. *State v. O'Guinn,* No. 13, 1990 WL 58740, at *1 (Tenn.Crim. App. May 9, 1990). Even though procedural default was the express basis of the state court's refusal to hear O'Guinn's claims, the federal district court did not even mention the waiver issue; it simply proceeded to consider the performance of trial counsel.

I have exhaustively reviewed the entire record in this case and have carefully considered each of O'Guinn's claims. I think that the argument that O'Guinn's ineffective assistance claim was not procedurally defaulted is insupportable. It is undisputed that O'Guinn failed to raise in his first post-conviction petition the issue of ineffective assistance of trial counsel. O'Guinn argues, as does Judge Merritt in his separate concurring opinion, that this failure does not call into play "cause and prejudice" analysis, *see generally Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) (quoting *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct.

---

**16.** O'Guinn did raise in his first post-conviction petition a claim that he received ineffective assistance of counsel from his attorney in *Alabama* (representing O'Guinn on the Alabama charges), who told O'Guinn that it was fine for him to talk to the Tennessee authorities about the Tennessee investigation. *See* O'Guinn's Petition for Post-Conviction Relief filed Jan. 29, 1987, ¶ 5; Brief of Petitioner–Appellant filed Jan. 18, 1989, at 49–

52 (brief on appeal of state court's denial of first post-conviction petition); *State v. O'Guinn,* 786 S.W.2d 243, 246–47 (Tenn.Crim.App.1989) (addressing issue of ineffective assistance of Alabama counsel). This, of course, does not amount to raising the issue of ineffective assistance of counsel at the sentencing phase of his *Tennessee* trial, *see* discussion *infra.*

2639, 2643–44, 91 L.Ed.2d 397 (1986)), because the state court in the *first* post-conviction proceeding ruled *sua sponte* on the effectiveness of trial, sentencing, and appellate counsel, and he therefore has not waived this issue. I believe this argument is untenable, as is the argument that the order of the Tennessee Court of Criminal Appeals did not rely clearly and expressly on a state procedural bar in affirming the denial of O'Guinn's second post-conviction petition raising this ineffective assistance claim.

During the period relevant here, Tennessee law governing post-conviction relief was set out in TENN.CODE ANN. §§ 40–30–101 to 124 (1990).[17] Section 40–30–111 defines the scope of post-conviction proceedings:

> The scope of the hearing shall extend to all grounds the petitioner may have, except those grounds which the court finds should be excluded because they have been *waived or previously determined,* as herein defined.

(emphasis added). Section 40–30–112 provides the definitions of "waived" and "previously determined":

> (a) A ground for relief is "previously determined" if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.

> (b)(1) A ground for relief is "waived" if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.

> (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

Thus, post-conviction proceedings in Tennessee are not proceedings in which the petitioner may collaterally attack prior holdings of a court or raise claims which were not raised at the earliest opportunity.

O'Guinn could have raised in his first post-conviction petition his claim of ineffective assistance of counsel during the sentencing phase of his murder trial. It is undisputed that he did not. Rather, his ineffective assistance claim in that first petition was only that his counsel in the *Alabama* proceedings had been ineffective.

The Tennessee Circuit Court noted that a claim of ineffective assistance of Alabama counsel was not a claim of ineffective assistance of counsel in the *Tennessee* proceedings, and that at the evidentiary hearing on the first post-conviction petition, O'Guinn, through counsel, had explicitly chosen not to present any evidence in regard to any claims other than the claim of inadequate Alabama counsel, and had in fact expressed satisfaction with his counsel in the Tennessee murder trial. In dicta, the circuit court "found" that on the record before it, Tennessee counsel had been effective. *State v. O'Guinn,* 786 S.W.2d 243, 246 (Tenn.Crim.App.1989). The circuit court found that none of the grounds alleged in the petition had merit, and denied the petition.

The Tennessee Court of Criminal Appeals affirmed. *Id.* In its opinion, the court said that the ineffective assistance claim that *was* raised in the first petition was " 'waived' within the meaning of TENN.CODE ANN. 40–30–111, and 112" because it had not been raised on the motion to suppress or on appeal. *Id.* at 247. The court noted that O'Guinn had not raised in this post-conviction proceeding any fault with trial counsel. However, the court did not affirm on the basis of the circuit court's affirmative "finding" of effective assistance of trial counsel, but because the issue was waived. Also in that opinion, the Tennessee Court of Criminal Appeals explicitly addressed O'Guinn's Fifth Amendment claim, noting that the trial court and the Tennessee Supreme Court on direct appeal had held that there had been no

---

**17.** This chapter of the Tennessee Code has subsequently been repealed and replaced by TENN.CODE ANN. §§ 40–30–201 through 222, applicable to petitions for post-conviction relief filed after May 10, 1995. The separate concurring opinion suggests that the new law's definitions of "waived" and "previously determined" may afford O'Guinn an avenue to petition the state courts for relief. I think it is clear, however, that those new definitions (like the rest of the new law's provisions) are considerably less favorable to petitioners than were the old ones, and neither those new definitions nor anything else in the new law provides O'Guinn any further avenues for relief in the state courts.

*Miranda* violations. Because this issue had been resolved on direct appeal, the Tennessee Court of Criminal Appeals held that O'Guinn's Fifth Amendment claim had been "previously determined" within the meaning of TENN.CODE ANN. §§ 40–30–111 to 112 (1990).

O'Guinn first raised the ineffective assistance of counsel at the sentencing phase of his Tennessee murder trial in his second post-conviction petition, along with a claim that the Tennessee death penalty statute was unconstitutional. The Tennessee Circuit Court held that all claims in the second post-conviction petition had been "waived" or "previously determined."

The Tennessee Court of Criminal Appeals affirmed. *O'Guinn*, 1990 WL 58740, at *1. The court reviewed the proceedings to date, noting that the first post-conviction petition had raised both a Fifth Amendment claim and a claim of violation of the Sixth Amendment right to effective assistance of counsel, that the denial of the first petition had been affirmed, and that the second post-conviction petition raised two claims—ineffective assistance of counsel and the unconstitutionality of the Tennessee death penalty statute. The court of criminal appeals then held:

> The petition before the Court alleges ineffective assistance of counsel and that the Tennessee Death Penalty Statute, T.C.A. § 39–2–203, is unconstitutional.
>
> The record, which includes the records in the trial and appeal of the conviction and the hearing and appeal of the prior post-conviction proceeding, supports the trial court's finding that the issues raised in this proceeding have been "waived" or "previously determined" within the meaning of T.C.A. § 40–30–112.
>
> The judgment is affirmed.

*O'Guinn*, 1990 WL 58740, at *1. The appellate court expressed no other ground for its ruling.

"Waived" and "previously determined" have explicit meanings in the Tennessee statutes governing post-conviction relief.

*See* TENN.CODE ANN. § 40–30–112 (1990). The court of criminal appeals clearly stated that the record before it in the second post-conviction proceedings included the first post-conviction proceedings. "Waived" and "previously determined" had the same meaning in both proceedings. Therefore, the ruling that the claims in the second proceeding were either waived or previously determined within the meaning of the statute can mean only that the ineffective assistance of counsel claim raised in the second petition was *either* a claim O'Guinn knowingly and understandingly failed to present previously for determination, *i.e.,* "waived," *or* a claim which was previously ruled on after a full and fair hearing, *i.e.,* "previously determined." Thus, unless the first post-conviction proceeding included a full and fair hearing on the ineffectiveness claim, that claim was "waived" under the Tennessee statute.

The language of TENN.CODE ANN. § 40–30–112 (1990), simply will not support a finding that the claim was "previously determined." There was never a full and fair hearing on the issue before the first post-conviction court because O'Guinn never raised the issue and never presented any evidence that might support a claim of ineffective assistance from which the court could have made such a determination. O'Guinn simply did not make the claim. Both the circuit court and the Tennessee Court of Criminal Appeals explicitly pointed out that O'Guinn did not raise in the first post-conviction proceeding any claim of ineffective assistance of counsel during the Tennessee murder trial. The circuit court's *sua sponte* remarks about the performance of Tennessee trial counsel were prefaced by the court's explicit statement that O'Guinn presented no evidence at that hearing relative to the performance of his trial counsel. Although the circuit court used the language of specific findings, I think it is clear that this language was unnecessary dicta, and that there is no actual holding from the state court with regard to ineffective assistance of counsel at the sentencing phase.[18]

---

18. The contrary approach would simply eliminate any distinction between properly substantiated findings of fact and conclusions of law and gratuitous dicta, with the result that courts might well refrain from including in their opinions full and open discussion and explanation for their views.

O'Guinn argues that this claim of ineffective assistance of counsel is not procedurally barred because the Tennessee court *sua sponte* ruled on it; however, he claims that the court committed constitutional error by ruling, on the basis of an inadequately developed record and wholly unsubstantiated findings, that his trial counsel was not ineffective. It is true that the record on the issue of ineffective assistance of counsel was completely undeveloped in the state court. But O'Guinn cannot have it both ways. It is precisely *because* O'Guinn failed to raise the claim in his first post-conviction petition and declined to present at the hearing any evidence relative to any claim other than his complaint about *Alabama* counsel, that the record before that court was wholly undeveloped on the issue of the adequacy of his Tennessee trial counsel.

Even assuming that the state court's gratuitous language constituted an express finding on this issue, this alone does not serve the statute's purposes for requiring the petitioner to raise an issue at the first available opportunity. Tennessee Code Annotated § 40–30–112(b)(1) says, "A ground for relief is 'waived' if the *petitioner* . . . failed to present it for determination . . ." (emphasis added). One of the purposes of the waiver rule is to require defendants to raise issues when those issues can best be addressed—*at trial. See Wainwright v. Sykes,* 433 U.S. 72, 88–91, 97 S.Ct. 2497, 2507–09, 53 L.Ed.2d 594 (1977) (offering several reasons for the waived-if-not-raised rule). Another purpose is to adjudicate expeditiously and efficiently all of the petitioner's claims when those claims become available. For example, O'Guinn's ineffectiveness claim was not really available at trial or on direct appeal, since he was represented by the same counsel for both, but it was obviously available when he filed his first post-conviction petition. As this case clearly illustrates, the goals of early, efficient and expeditious adjudication are ill-served by holding that if the *court* raises these issues, *sua sponte,* that is good enough. Nor are the interests of the petitioner served by such a ruling, as one of O'Guinn's criticisms of the state court's decision in this case proves: If it is true that the post-conviction court discussed this issue without the benefit of a fully-developed record, it is true, as I stated above, *precisely because* O'Guinn never raised the issue and therefore he never developed the record.

Finally, in my view, the decision of the Tennessee Court of Criminal Appeals affirming the denial of O'Guinn's ineffective assistance of counsel claim meets the requirements of *Harris. Harris* held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." 489 U.S. at 263, 109 S.Ct. at 1043. Here, the Tennessee Court of Criminal Appeals was the last state court to rule on the issue. In a decision resting squarely on the Tennessee statute, that court held solely that the two claims raised in O'Guinn's second post-conviction petition had been either " 'waived' or 'previously determined' within the meaning of T.C.A. § 40–30–112." *O'Guinn,* 1990 WL 58740, at *1. One of those claims was the claim of ineffective assistance of counsel during the Tennessee murder trial. It is not necessary for purposes of *Harris* that the Tennessee court spell out in that opinion exactly what the terms "waived" and "previously determined" mean. Because, as I have explained above, TENN.CODE ANN. § 40–30–112 simply does not permit a finding that the ineffectiveness claim had been "previously determined," the order of the Tennessee Court of Criminal Appeals does clearly and expressly rely on the state procedural bar of waiver as the sole ground for rejecting this claim.

On federal habeas review, a district court may consider an issue that has been procedurally defaulted only if the petitioner can show (1) good "cause" for his procedural default and (2) "prejudice" that would result from the federal court's refusal to consider the issue. *Murray v. Carrier,* 477 U.S. 478, 487, 106 S.Ct. 2639, 2644–45, 91 L.Ed.2d 397 (1986). Where a habeas petitioner fails to establish "cause" and/or "prejudice," the habeas court may consider the defaulted claim only if the petitioner is able to show a proba-

bility of actual innocence. *See id.* at 496, 106 S.Ct. at 2649–50.

Here O'Guinn claims that his counsel at the sentencing phase of his trial was ineffective, and that his post-conviction counsel failed to raise this claim timely because his first post-conviction counsel was ineffective. While ineffective assistance of counsel may constitute "cause" for procedural default, it cannot do so here.

The Supreme Court has held that because there is no constitutional right to counsel in state post-conviction proceedings, *see Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), there can be no constitutionally ineffective assistance of counsel in such proceedings, *see Coleman v. Thompson,* 501 U.S. 722, 752–53, 111 S.Ct. 2546, 2566–67, 115 L.Ed.2d 640 (1991).[19] In *Coleman,* the petitioner blamed his untimely notice of appeal of a state habeas determination on his attorney's ineffective assistance. The Court held that this did not establish "cause" and that the federal court therefore could not hear issues raised in that state habeas action, since petitioner procedurally defaulted by not appealing. *See id. See also Wainwright v. Torna,* 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) (holding that where there is no constitutional right to counsel there can be no deprivation of effective assistance). Because O'Guinn cannot show "cause," our analysis is limited to review for "actual innocence."

I believe the district court therefore erred first in failing to engage in any cause and prejudice analysis, and second, in granting the writ based on its independent review of trial counsel's performance.

I note that O'Guinn relies exclusively on his ineffective assistance claim to establish "cause" with regard to his failure to assert on direct appeal or in his first collateral attack his claim of ineffective assistance of counsel at sentencing. Since this contention is insufficient to show "cause," our review (and the review that should have been undertaken by the district court) is extremely narrow: O'Guinn's sentence is reviewable only to determine whether he is "actually innocent" of the death penalty. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is *actually innocent,* a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (emphasis added); *see also Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992) (finding that the "actual innocence" exception to waiver rule applies to procedurally defaulted claims that relate to death sentence itself).

While the Supreme Court has recognized that the "actual innocence" exception may apply to the penalty phase in capital cases, the Court has described it as a "very narrow exception." *Sawyer,* 505 U.S. at 341, 112 S.Ct. at 2520. To establish "actual innocence" of the death penalty, the petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would [have found] him *eligible* for the death penalty under [state] law."[20] *Id.* at 348, 112 S.Ct. at 2523 (emphasis added). "[T]he 'actual innocence' requirement must focus on those elements which render a de-

**19.** I would not require O'Guinn to show cause as to why he failed to raise his ineffectiveness claim at trial or on direct appeal. He had the same counsel for both of these stages, and Tennessee courts have held that in such a case, an ineffectiveness claim is not waived within the meaning of TENN.CODE ANN. § 40–30–112 because it would be unreasonable to expect trial counsel to call to the court's attention their own incompetence (if any). *See Nelson v. State,* No. 267, 1990 WL 149226 at *3, 1990 Tenn.Crim.App. LEXIS 675, at *5–6 (Tenn.Crim.App. Oct. 9, 1990); TENN. CODE ANN. § 40–30–112(b)(1)(1990); *cf. State v. Sluder,* No. 1236, 1990 WL 26552 at *7, 1990 Tenn.Crim.App. LEXIS 222, at *23 (Tenn.Crim. App. Mar. 14, 1990) (recommending that counsel on direct appeal *not* assert claims of ineffective assistance at trial; better approach is to raise issue in first post-conviction petition instead of on direct appeal), *appeal denied,* (Tenn. July 16, 1990).

**20.** Of course, a petitioner may also show that he is actually innocent of the death penalty by disproving an element of the underlying crime. *See Sawyer,* 505 U.S. at 340–41, 112 S.Ct. at 2519–20. However, a very thorough review of the entire record in this case leads to the inescapable conclusion that O'Guinn is unable to accomplish a showing of actual innocence of the Cupples rape and murder.

fendant *eligible* for the death penalty, and not on additional mitigating evidence which was prevented from being introduced as a result of a claimed constitutional error." *Id.* (emphasis added).

O'Guinn's assertion that his trial counsel should have presented additional *mitigating* evidence does not meet the *Sawyer* standard. Had O'Guinn's trial counsel put on the testimony of relatives and friends about the awfulness of O'Guinn's childhood, this would have done nothing to rebut the presence of the aggravating circumstances that caused the jury to find O'Guinn *eligible* for the death penalty and upon which they sentenced him to death. Because O'Guinn has not met the *Sawyer* standard for establishing actual innocence of the death penalty, and because O'Guinn otherwise waived his ineffective assistance argument, the district court erroneously granted the writ on the basis of the ineffective assistance of O'Guinn's counsel at sentencing.[21]

### D. *O'Guinn's Cross–Appeal*

In addition to his alleged *Brady* claim, O'Guinn's cross-appeal argues that his petition for writ of habeas corpus should have been granted based on (a) the State's alleged interference with O'Guinn's ability to present the testimony of Michael and Debbie Spears and the State's misrepresentation as to the Spearses' whereabouts (the "Spears" claim), (b) the State's intimidation of Dianna King to procure false testimony (the "King" claim), (c) the State's use of an impermissibly suggestive photo array in securing Danny Dunn's identification of O'Guinn as the man with whom Sheila had left the Hat & Cane Club on the night of her murder (the "Dunn" claim), (d) the State's presentation of "surprise" testimony of Dr. Harlan regarding the *premortem* infliction of the wound to Sheila's vaginal vault (the surprise testimony claim), (e) the unconstitutionality of the Tennessee death penalty statute as applied in this case, (f) the degree of reliability of O'Guinn's conviction and sentence as required by the Eighth Amendment, (g) the ineffective assistance of counsel at the guilt stage of O'Guinn's trial, and (h) the alleged violation of the Fourteenth Amendment (due process) in taking O'Guinn's statements. The district court found each of O'Guinn's contentions to be without merit. As to most of these, the separate concurring opinion suggests that they may have merit or that they should be raised in the state court pursuant to the new Tennessee Post–Conviction Procedures Act.

---

**21.** Even under the district court's own findings, the writ should not have been granted. The court described the standard for independent review of an ineffective assistance claim as requiring that "but for counsel's unprofessional error, the result of the proceeding would likely have been different," but the court's own finding fails to meet this standard. *O'Guinn v. Dutton,* 870 F.Supp. 779, 785–86 (M.D.Tenn.1993). The district court found that "had counsel investigated O'Guinn's background and character, they could have presented strongly mitigating evidence based upon which the jury *might have* refused to impose the death penalty" (emphasis added). The district court's "might have" language does not satisfy *Strickland*'s "would likely have" standard. Nor does it satisfy the requirement of *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 842–44, 122 L.Ed.2d 180 (1993), that mere likelihood of a different result is not enough since "[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372, 113 S.Ct. at 844. Although the district court later properly recited the *Strickland* standard when it wrote, "The court finds that had the jury considered this evidence, there ex-

ists a reasonable probability that it would not have sentenced O'Guinn to die for the murder of Sheila Cupples," it is far from clear that the latter is the standard the court actually applied.

And, of course, even the *Strickland* standard is a far cry from the one that actually applies in this case: "to show 'actual innocence' one must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner *eligible* for the death penalty...." *Sawyer,* 505 U.S. at 348, 112 S.Ct. at 2523 (emphasis added). O'Guinn now attempts to argue that *Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), has superseded *Sawyer;* however, it is clear that *Schlup* holds that the standard of *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), rather than the *Sawyer* standard is required when the claim is actual innocence of the crime. *Schlup* continues to recognize the applicability of *Sawyer* when the issue is, as here, eligibility for the death penalty. —— U.S. at ——, 115 S.Ct. at 867. Even if this were not so and the less stringent *Carrier* standard were applied in O'Guinn's case, he still would have to show that it was more likely than not that no reasonable juror would have found him eligible for the death penalty.

TENN.CODE ANN. §§ 40–30–201 to 222 (Supp. 1995). I believe that most of these claims were procedurally defaulted, and that they may not properly be considered by the federal habeas court. Those that were not procedurally defaulted are without merit.

### 1. Procedurally Defaulted Claims

The district court did not address the procedural default defense raised by the State. However, it is clear that most of these claims are procedurally defaulted and cannot be raised by petitioner in this federal habeas petition.

One of these claims involves Michael and Debbie Spears, potential witnesses for either the State or petitioner at trial. O'Guinn argued that his constitutional right to a fair trial was violated when the State interfered with his ability to interview the Spearses and intimidated them into not cooperating with the defense. He contends that the Spearses had information or testimony beneficial to his defense. He also alleges that the State secreted the Spearses during trial and then misrepresented to the jury that they were unable to attend the trial because of adverse weather, but that if they had attended, they would have been witnesses for the State. As discussed *supra*, the district court heard testimony from Michael Spears regarding these claims, rejected it as completely incredible, and denied O'Guinn's claim.

The second claim involves O'Guinn's assertion that the State intimidated witness Dianna King into giving false testimony at trial. She testified that on the night of the murder, she danced with O'Guinn at the Hat & Cane Club. At the evidentiary hearing before the district court, King recanted her testimony, claiming that an investigator threatened her into giving false testimony. The district court found King not to be credible and denied O'Guinn's claim.

O'Guinn's third claim is that state witness Danny Dunn's identification testimony was based upon an impermissibly suggestive photo array. O'Guinn also argued that Dunn's

limited cognitive abilities and the two-year time lapse between the crime and the time that Dunn was shown the photo array makes his testimony inherently unreliable. The district court failed to address this claim.

The fourth and fifth claims are that O'Guinn's conviction and death sentence fail to carry the heightened degree of reliability required by the Eighth and Fourteenth Amendments and that his statements were coerced by investigators while he was mentally and physically infirm, in violation of his Fourteenth Amendment due process rights. He does not explain these claims on appeal, but complains that the district court failed to address them. The sixth claim is O'Guinn's claim of ineffective assistance of counsel at the guilt phase.

O'Guinn never raised any of these claims on direct appeal or in any of his post-conviction motions. The Tennessee Post–Conviction Procedures Act contains a three-year statute of limitations period for filing claims that were clearly available to the petitioner during that time period:

> A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under the chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred.

TENN.CODE ANN. § 40–30–102 (1990). Because of his failure to raise timely these claims, no state post-conviction remedy is available in which to raise them now.[22] *See, e.g., Caruthers v. State,* 814 S.W.2d 64, 69–70 (Tenn.Crim.App.1991) (stating that petition filed outside statute of limitations period should be summarily dismissed). As a result, O'Guinn's claims are deemed exhausted under § 2254. *See Teague v. Lane,* 489 U.S. 288, 298, 109 S.Ct. 1060, 1066, 103 L.Ed.2d 334 (1989).

Under *Teague* and *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), O'Guinn is barred from raising these

---

22. Even if O'Guinn's second post-conviction petition can be broadly construed to allege any or all of these claims, he nonetheless failed to overcome the rebuttable presumption "that a ground for relief not raised in any such proceeding which was held was waived." TENN.CODE ANN. § 40–30–112(b)(2) (1990).

claims unless he can show both cause for the default and prejudice resulting from it. *Teague,* 489 U.S. at 297–99, 109 S.Ct. at 1068–69 (citing *Engle v. Isaac,* 456 U.S. 107, 113–114, 117, 124–35, 102 S.Ct. 1558, 1564–65, 1566, 1570–76, 71 L.Ed.2d 783 (1982) (applying procedural default rule to claim that had never been raised in state court)); *see also Riggins v. McMackin,* 935 F.2d 790, 792–93 (6th Cir.1991) (finding procedural bar where claim was never raised in state court and no state court remedy was available). And, as noted *infra,* in the extraordinary case in which a constitutional error has "probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default," *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649.

O'Guinn has failed to satisfy the cause and prejudice requirements as to any of these claims, and he has raised a claim of actual innocence of the crime only as to some. However, because actual innocence is material to each of these defaulted claims, I review each of them in light of O'Guinn's claim of actual innocence.

Claims of actual innocence of the crime must be reviewed under the standard set out in *Carrier,* 477 U.S. 478, 106 S.Ct. at 2640, and reaffirmed in *Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "To establish the requisite probability [that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent,' *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649], the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.... *Carrier* requires a petitioner to show that he is 'actually innocent.' " *Schlup,* —— U.S. at ——, 115 S.Ct. at 867.

Regarding the Spears and King claims, petitioner argues that he could not discover the claims earlier because of the egregious conduct of the government in intimidating and threatening these witnesses. Their testimony was the only evidence petitioner presented of such misconduct, and the district court found the stories told by these witnesses to be completely incredible, thereby destroying the factual basis for petitioner's cause argument. I find nothing in the record to indicate that the district court's credibility determinations are erroneous.[23] Consequently, cause has not been shown. Further, the findings of incredibility demonstrate that this evidence cannot meet the *Carrier /Schlup* test for actual innocence.

O'Guinn's claims relating to Dunn go solely to the reliability and credibility of Dunn's testimony, questions appropriately answered by the jury, and to identification of O'Guinn. I have reviewed the entire record relative to the photo array claimed by O'Guinn to be impermissibly suggestive, and conclude first, that O'Guinn's characterization of the array is not supported by the record, and second, that this claim is without merit. *See Manson v. Brathwaite,* 432 U.S. 98, 112–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977). The heightened reliability claim hinged on the success of the Spears, King and Dunn claims, all of which I believe are without merit.

O'Guinn also argued (although he may have abandoned this claim on rehearing *en banc* ) that the Tennessee post-conviction statute did not provide him a minimally adequate forum in which to discover and air these claims because it does not mirror the federal habeas provisions. He argues that this court should therefore overlook a procedural default and provide him with a forum. Whether or not Tennessee's post-conviction statute should more closely track the federal habeas statute does not address the question of cause for failing to raise these arguments below. O'Guinn clearly knew of and could have raised these claims throughout his direct appeal and post-conviction proceedings. His criticisms of Tennessee's Post Conviction Procedures Act do not address the question of cause and prejudice. Because O'Guinn has not established cause for failing to raise these claims before the Tennessee courts and because none of the factual allegations used to support his argument provides evidence that more likely than not no reasonable juror would have found O'Guinn guilty of the murder, *see Schlup,* —— U.S. at ——, 115 S.Ct. at

**23.** *See* footnote 3.

867, the federal habeas court is barred from reviewing these claims.

Regarding the coercion of his statements, O'Guinn attempts to bootstrap this claim onto his Fifth Amendment claim. However, as I indicated earlier in this dissenting opinion, O'Guinn never alleged as a basis for suppression of his statements that he was under any physical or mental coercion, such an argument has never been addressed by the state courts, and he presents no new evidence in these habeas proceedings to support such a claim. Therefore, this claim has also been procedurally defaulted, no cause for or prejudice resulting from the default having been shown, and because the confessions are neither unreliable nor suspect, no miscarriage of justice would result from our failure to hear this claim. *Id.* at ——, 115 S.Ct. at 864 (citing *Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649–50) (federal habeas court may grant the writ in an extraordinary case where there has been a fundamental miscarriage of justice even in the absence of a showing of cause for the procedural default).

Finally, O'Guinn has not shown cause for failing to raise timely his claim of ineffective assistance of counsel during the guilt phase of his trial, or prejudice as a result of the ineffective assistance. The district court held, albeit without a statement of its reasons, that this claim was meritless. Nothing in the record indicates that cause and prejudice can be shown, and therefore this claim was procedurally defaulted. As with the other defaulted claims, O'Guinn has wholly failed to demonstrate that he is actually innocent and that, but for the ineffective assistance of his trial counsel, it is more likely than not that no reasonable juror would have convicted him. *Id.* at ——, 115 S.Ct. at 867.

### 2. *Surprise Testimony and Application of Death Penalty Statute*

O'Guinn's final two claims involve the surprise testimony of the state pathologist Dr. Harlan and the constitutionality of the application of the death penalty in this case. These claims were properly preserved for habeas review. Both were addressed by the Tennessee Supreme Court on direct appeal. As explained below, I believe we should af-

firm the district court's denial of both claims on the merits.

#### a. *Dr. Harlan Surprise Testimony Claim*

During their preparation for trial, defense counsel contacted Dr. Fransesco, a medical examiner who had custody of the autopsy reports which had been prepared by pathologist Dr. Harlan. Dr. Fransesco told defense counsel that the reports contained no determination of whether the victim had been alive at the time of sexual penetration. At trial, Dr. Harlan testified that it was his medical opinion that the victim *had* been alive at the time she was penetrated with a blunt metal or wooden object that lacerated her vaginal wall. O'Guinn moved for a mistrial on the grounds that this testimony surprised him in violation of his due process rights. The motion was denied, and on direct appeal the Tennessee Supreme Court rejected O'Guinn's challenge, ruling that defense counsel's surprise could not be attributed to the State because the State had provided the defense with a copy of Dr. Harlan's autopsy report as required by Tennessee discovery rules.

During the federal habeas evidentiary hearing, the district court heard testimony from Dr. Sperry. O'Guinn argued that Dr. Sperry could have been used to rebut Dr. Harlan's testimony had he known in advance of the content of Dr. Harlan's testimony. The district court rejected O'Guinn's argument. It found that although Dr. Harlan's testimony was a surprise to O'Guinn as well as to the State, Dr. Sperry would not have been able to rebut Dr. Harlan's testimony and therefore O'Guinn had failed to show any prejudice stemming from the surprise testimony.

I agree with the district court that Dr. Sperry's testimony could not have rebutted Dr. Harlan's testimony. Dr. Sperry testified only that he could not make a determination whether the victim was alive when she was penetrated with the blunt metal or wooden object. Consequently, although Dr. Harlan's testimony may have come as a surprise to O'Guinn, the surprise did not stem from action or inaction by the State. In fact, the State was itself surprised by Dr. Harlan's

testimony. Further, the content of the surprise testimony related primarily to the sentencing determination. As explained in the next subsection and as found by the Tennessee Supreme Court, regardless of the testimony regarding the timing of the rape, substantial evidence existed to support the jury's recommendation of the death penalty. Therefore, I agree with the district court that O'Guinn was not prejudicially surprised.

### b. Constitutionality of the Death Penalty Statute in this Case

O'Guinn challenges the constitutionality of Tennessee's death penalty statute as applied in this case. In capital punishment cases, the Eighth Amendment places requirements on two areas of decisionmaking: eligibility and selection. *Tuilaepa v. California,* — U.S. —, —, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). Federal court review of a state death penalty statute for vagueness with regard to eligibility and selection factors is quite deferential. *Id.* at —, 114 S.Ct. at 2635. "In providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." *Id.* at —, 114 S.Ct. at 2636. "For purposes of vagueness analysis, ... our concern is that the [propositional factor of the statute challenged as being void on grounds of vagueness] have some 'common-sense core of meaning ... that criminal juries should be capable of understanding.'" *Id.* (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976) (White, J., concurring in judgment)).

O'Guinn's challenge is to the eligibility aspect of the Tennessee death penalty statute. In order for a defendant to be found eligible for the death penalty in a homicide case, the Supreme Court has required the jury to convict the defendant of murder and find one "aggravating circumstance" at the guilt or penalty phase. *Id.* at —, 114 S.Ct. at 2634. An aggravating circumstance must meet two requirements. *Id.* at —, 114 S.Ct. at 2635.

First, it may not apply to every defendant convicted of murder. *Id.* Second, it may not be unconstitutionally vague. *Id.*

The Tennessee death penalty statute in effect when O'Guinn was convicted and sentenced provided:

> No death penalty shall be imposed but upon a unanimous finding ... of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:
>
> . . . .
>
> (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

TENN.CODE ANN. § 39–2–203(i)(5) (1982).[24] O'Guinn argues that the words "depravity" and "torture" are unconstitutionally vague because those words do not provide adequate guidance to the jury in deciding whether to impose the death penalty.

The Tennessee Supreme Court considered the "heinous, atrocious, or cruel" aggravating circumstance and analyzed its constitutional validity in *State v. Williams,* 690 S.W.2d 517 (Tenn.1985). The court reviewed comparable aggravating circumstances provisions in other states' death penalty statutes, noting that "cruelty" involves the pain and distress the murderer inflicts upon his victim, while "depravity" concerns the mental state and attitude of the murderer as evinced by his words and actions at the time of the killing. *Id.* at 525–29. Thus, courts considering similar statutory language had drawn a distinction between the statutory language describing the crime ("cruel") and the criminal ("depraved"). *Id.* at 528–29. The court in *Williams* determined that the first clause provided that the murder, *i.e.,* the crime of conviction, must be "especially heinous, atrocious, or cruel." *Id.* at 529. According to the court, the second clause, "in that it involved torture or depravity of mind," is a limiting provision which serves to restrict the first clause. *Id.*

The words of limitation in the aggravating circumstance provision at issue here are in

---

**24.** A substantially similar provision is now found at TENN.CODE ANN. § 39–13–204(i)(5) (Supp.1995): "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

the disjunctive; there is an aggravating circumstance to support the death penalty if the murder involved *either* "torture" *or* "depravity of mind." The Tennessee Supreme Court in *Williams* specifically defined "torture" and "depravity of mind," thereby narrowing the definition of these terms for the purpose of the "heinous, atrocious, or cruel" aggravating circumstance. According to the court:

"Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is "the murderer's state of mind at the time of the killing" which must be shown to have been depraved.

Thus, mutilation of the dead body of the victim may be found to constitute depravity of mind, but only if the mutilation occurred so soon after the death of the victim that the inference may be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. If the length of time intervening between the time of death of the victim and the time of mutilation of the body is so great that the

inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, then it cannot be said that the murder, itself, involved depravity of mind.

*Id.* 529–30 (citations omitted). As explained by the court, "torture" involves acts in addition to whatever act was necessary to cause death. Thus, in *Williams,* the Tennessee Supreme Court narrowed the definition of the phrase "in that it involved torture or depravity of mind" so that depravity may be shown by torture or by acts (such as mutilation) occurring close in time following the death of the victim.[25]

As defined by the Tennessee Supreme Court, the "heinous, atrocious, or cruel" aggravating circumstance satisfies the requirements set out in *Tuilaepa,* —— U.S. at ——, 114 S.Ct. at 2635. The terms are neither unconstitutionally vague, nor do they apply to every defendant convicted of murder. A capital sentencing scheme is not unconstitutionally vague if it provides a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (quoting *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). In narrowing the definition of the "heinous, atrocious, or cruel" aggravating circumstance, and by requiring that the jury be specifically instructed, the Tennessee Supreme Court in *Williams* reduced or eliminated the risk that the death penalty, based on that aggravating factor, would "be inflicted in an arbitrary and capricious manner." *Id.* Consequently, the narrowed definition of *Williams* is narrowly tailored and passes constitutional muster. Likewise, the narrowed definition of the legal terms of this aggravating factor, and the requisite jury

---

**25.** After narrowing the definition of these legal terms, the state supreme court held that the imposition of the death penalty is improper unless the jury has first been fully instructed regarding the legal significance of the terms "heinous," "atrocious," "cruel," "torture," and "depravity of mind" as used in the aggravating circumstance. *Williams,* 690 S.W.2d at 533. Since the Tennessee Supreme Court decision in

*Williams,* the United States Supreme Court has held that "a state appellate court [may uphold] a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing ... the aggravating and mitigating evidence or by harmless-error review." *Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 1444, 108 L.Ed.2d 725 (1990), discussed *infra.*

instruction, ensures that the "heinous, atrocious, or cruel" factor will not apply to every defendant convicted of murder. It cannot be said that all murders involve the "infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Williams*, 690 S.W.2d at 529. Nor do all murders involve the killer's mutilating his victim's body immediately after the murder such as would demonstrate the murderer's depravity of mind. *Id.* at 530.

At O'Guinn's trial, the court instructed the jury that it could sentence the defendant to death if the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." The jury did not receive any further instruction regarding this aggravating circumstance. After deliberation, the jury returned a written verdict stating:

> We, the jury, unanimously find the following list of statutory aggravating circumstances:

> The murder was especially heinous, atrocious, or cruel, [in] that it involved torture and depravity of mind.

> We the jury unanimously find that there are no mitigating circumstances that sufficiently substantially outweigh the statutory aggravating circumstances or circumstances so listed.

Because the jury was not instructed regarding the definition of the terms in the "heinous, atrocious, or cruel" aggravating circumstance as narrowed by *Williams*, O'Guinn argues that the jury relied on a constitutionally impermissible factor when it weighed the aggravating factors against the mitigating factors. On appeal, the Tennessee Supreme Court agreed that the jury had not been properly instructed in this regard. Consequently, the state supreme court undertook a reevaluation of the evidence which

was before the jury to determine whether that evidence supported a finding of the "heinous, atrocious, or cruel" aggravating circumstance, as defined by the narrowed construction. The court found that it did.

In *Clemons v. Mississippi*, the United States Supreme Court held that the Constitution "does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." 494 U.S. 738, 741, 110 S.Ct. 1441, 1444, 108 L.Ed.2d 725 (1990). According to the Court, "[i]t is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in 'weighing' States, to consider whether the evidence is such that the jury could have arrived at the death sentence that was imposed." *Id.* at 748–49, 110 S.Ct. at 1448. Responding to Clemons' argument that the Mississippi Supreme Court had not actually reweighed the evidence in his case, but had instead simply held that when an aggravating circumstance relied on by the jury was invalidated, the sentence could nonetheless be affirmed because at least one valid and undisturbed aggravating circumstance remained, the Supreme Court noted:

> We find the opinion below unclear with respect to whether the Mississippi Supreme Court did perform a weighing function, either by disregarding entirely the "especially heinous" factor and weighing only the remaining aggravating circumstance against the mitigating evidence, or by including in the balance the "especially heinous" factor as narrowed by its prior decisions and embraced in this case.

*Id.* at 751, 110 S.Ct. at 1449.[26] Accordingly, we must determine whether the Tennessee

---

**26.** The Court in *Clemons* made it clear that state appellate courts were not necessarily required to engage in reweighing or harmless-error analysis when errors had occurred in a capital sentencing proceeding. *Clemons*, 494 U.S. at 754, 110 S.Ct. at 1451. According to the Court, "[o]ur holding is only that such procedures are constitutionally permissible." *Id.* Subsequent to the Court's opinion in *Clemons*, however, the Court has stated several times that either reweighing or harm-

less-error review is required. *Sochor v. Florida*, 504 U.S. 527, 532, 112 S.Ct. 2114, 2118–19, 119 L.Ed.2d 326 (1992); *Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992) ("When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.").

Supreme Court either reweighed or conducted a harmless-error review.

As narrowed by *Williams,* the aggravating circumstance at issue here contains the "factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death,'" required by *Tuilaepa.* —— U.S. at ——, 114 S.Ct. at 2635 (quoting *Arave v. Creech,* 507 U.S. 463, 471, 113 S.Ct. 1534, 1540, 123 L.Ed.2d 188 (1993)). The "especially heinous, atrocious or cruel" murder must involve torture or depravity of mind. "Torture"—actions taken by the killer which go beyond mere killing of the victim and which inflict pain before death—and "depravity of mind"—the perverse and vile state of mind of the killer—are factual limitations on the crime itself and on the killer, which must be supported by the evidence in the case.

In O'Guinn's case, the Tennessee Supreme Court determined that the evidence presented to the jury, including the testimony of Dr. Harlan, supported the jury's finding of the aggravating circumstance as it was narrowly defined in *Williams. See State v. O'Guinn,* 709 S.W.2d 561, 567 (Tenn.1986). Applying the *Williams* definition to O'Guinn's case, the Tennessee Supreme Court found that Dr. Harlan's testimony, was admissible and, provided sufficient evidence to permit the jury to infer that the victim was alive at the time of penetration and other brutal acts and was therefore tortured by petitioner. *O'Guinn,* 709 S.W.2d at 567. In the alternative, the court reasoned *arguendo* that even if the victim was dead at the time of the rape, the actions of the killer were of such a nature and timing "that the inference can be fairly drawn that the defendant possessed the requisite 'depravity of mind.'" *Id.* at 568. I do not believe we can say that these findings were erroneous; to the contrary, they are amply supported by the record.

This case is distinguishable from others in which one of multiple aggravating circumstances found by a jury was found to be invalid. *See, e.g., Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (finding four aggravating circumstances); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (finding

two aggravating circumstances); *Wainwright v. Goode,* 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (per curiam) (finding three aggravating circumstances). In cases such as those, the reviewing court is faced with a different combination of factors from those the jury considered and must therefore reweigh only the remaining aggravating circumstances against any mitigating factors. In this case, however, the evidence and the combination of factors considered by the Tennessee Supreme Court is the *same* as the evidence and the combination of factors considered by O'Guinn's jury. The jury in this case found only one aggravating circumstance: that "the murder was especially heinous, atrocious, or cruel [in] that it involved torture or depravity of mind." The jury further found that this aggravating circumstance was not "sufficiently substantially outweigh[ed]" by any mitigating circumstances. The Tennessee Supreme Court did not invalidate that aggravating circumstance, but rather applied the properly narrowed construction of that aggravating circumstance and determined that the evidence clearly supported the jury's finding under that narrowed definition. The Tennessee Supreme Court thus had nothing to "reweigh." The proper course was the one taken by the Tennessee Supreme Court: to apply the properly defined aggravating circumstance to the jury's findings under a harmless-error review. *See Clemons,* 494 U.S. at 752, 110 S.Ct. at 1450.

In *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court essentially held that even when a jury is instructed using a vague or improperly defined aggravating circumstance, the sentence should be upheld by a federal court if (1) the state appellate courts have defined more specifically the meaning of the aggravating circumstance and (2) a state appellate court reviewing the instant case has determined that the evidence in the case supports the circumstance as properly defined. *See id.* at 653–54, 110 S.Ct. at 3057–58. The Tennessee Supreme Court's analysis comports with the requirements of *Walton.* Likewise, by applying the properly narrowed definition of the "heinous, atrocious, or cruel" aggravating circumstance, the Tennessee Su-

preme Court "actually perform[ed] a new sentencing calculus." *Richmond v. Lewis,* 506 U.S. 40, 49, 113 S.Ct. 528, 535, 121 L.Ed.2d 411 (1992).

When reviewing for harmless error, " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. State of Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In conducting this review, the court need not "utter[ ] the magic words, 'harmless error.' " *Sochor v. Florida,* 504 U.S. 527, 541, 112 S.Ct. 2114, 2123, 119 L.Ed.2d 326 (1992) (O'Connor, J., concurring). The reviewing court must believe that the error was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. The Supreme Court has been explicit in requiring a reviewing court to make a specific finding of harmless error. *See Sochor,* 504 U.S. at 541, 112 S.Ct. at 2123–24 (1992) (O'Connor, J., concurring).

The Tennessee Supreme Court conducted a detailed examination of the underlying evidence and found that the proof clearly supported the aggravating circumstance as defined in *Williams.* The court thereby proved that the failure adequately to instruct the jury did not contribute to imposition of the death penalty. Although I believe that the Tennessee Supreme Court implicitly found harmless error in the failure adequately to instruct the jury in O'Guinn's case, I acknowledge that the court may not explicitly have done so. I think that although the Tennessee Supreme Court did not make an explicit finding of harmless error, that court did adequately weigh the sole aggravating circumstance against the mitigating evidence presented at trial and that the court weighed these factors correctly.

I note that the circuits have split over whether a federal court may perform a harmless-error analysis in this context. I would follow the Fourth and Eighth Circuits

in holding that federal courts are authorized to assess the error committed in a sentencing proceeding for harmlessness prior to granting habeas relief. *Smith v. Dixon,* 14 F.3d 956, 976 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 72 (1995); *Williams v. Clarke,* 40 F.3d 1529, 1540 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995); *contra Wiley v. Puckett,* 969 F.2d 86, 94 n. 8 (5th Cir.1992) (stating only that *"Clemons* and *Stringer* are quite clear, however, that any such analysis must be performed by the state courts.").

The Supreme Court has never expressly stated whether or not federal habeas courts may conduct a harmless-error analysis of a vague aggravating circumstance error. The Court, however, has distinguished between errors that a reviewing court may review for harmless error and those that it may not, and has not spoken to the issue of which courts may conduct the harmless-error analysis. *See Smith,* 14 F.3d at 975 (citing cases). Thus, because the Supreme Court has held that the error caused by weighing a vague circumstance by a state sentencer is the type of error subject to a harmless-error analysis, *id.* at 976 (citing *Clemons,* 494 U.S. at 752, 110 S.Ct. at 1450), the logical conclusion is that federal courts can supply the harmless-error analysis.

Although in similar cases the Supreme Court has authorized state appellate courts in a weighing state to reweigh or conduct a harmless-error analysis, "none of the opinions containing this language were ones in which a lower federal court had conducted, or refused to conduct, harmless error review." *Smith,* 14 F.3d at 977. In *Sochor* and *Clemons,* the Supreme Court was hearing an appeal on direct review from a state appellate court and was "explaining what avenues of analysis [were] available to the *state* appellate courts." *Williams,* 40 F.3d at 1540 n. 5. *Stringer* and *Richmond* both involved an habeas action "where harmlessness was not at issue." [27] *Id.*

---

**27.** In *Stringer,* the court stated that the "use of a vague ... aggravating factor in the weighing process invalidates the sentence and ... requires constitutional harmless-error analysis or re-

weighing in the state judicial system." *Stringer,* 503 U.S. at 237, 112 S.Ct. at 1140. As the Fourth Circuit has pointed out, "the better reading of this passage is that 'in the state judicial

Finally, although it may not be entirely clear from Supreme Court precedent, I think that it is appropriate under the circumstances of this case that the federal court perform the harmless-error analysis.[28] *Accord Smith,* 14 F.3d at 976 (citing *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). *Brecht* stated that " '[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.' " *Brecht,* 507 U.S. at 635, 113 S.Ct. at 1720 (quoting *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982)). As the Fourth Circuit concluded,

> before overturning final and presumptively correct state convictions or sentences on federal habeas review, federal courts must assess for harmlessness those errors that are eligible for this review in order to assure that the extraordinary relief provided by the writ is granted only to those " 'persons whom society has grievously wronged.' "

*Smith,* 14 F.3d at 976 (quoting *Brecht,* 507 U.S. at 634, 113 S.Ct. at 1719 (quoting *Fay v. Noia,* 372 U.S. 391, 441, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963))).

After exhaustively reviewing the record in this case and applying a harmless-error analysis, I would find that the vague jury instruction was harmless. The Tennessee Supreme Court correctly found that the evidence supports the jury's finding that the murder involved "torture or depravity of mind." *See O'Guinn,* 709 S.W.2d at 567. It is obvious that the jury believed there was evidence of torture (Dr. Harlan's testimony and other evidence that the victim was alive when the defendant "twisted one of her nipples with a pliers-like instrument until it left a ridged abrasion, and rammed a hard, firm object into her vagina with such force that it tore the elastic vaginal tissue"). *Id.* There is also

evidence, through the defendant's statements, of depravity of mind, either through (1) torture of the victim before the killing; (2) mutilation of the victim's body while the killer thought the victim was still alive or possibly alive; or (3) mutilation of the victim's body immediately upon death, knowing she was dead.

Therefore, the jury could have found *both* torture and depravity of mind, or *either* torture *or* depravity. Since it would be enough under the narrowed Tennessee statute for the jury to have found *either* torture *or* depravity, and there was evidence to support a finding of either torture or depravity or both, there is no need to determine which of the two alternatives the jury actually found (or whether the jury found both alternatives). The fact that, tracking the language of the statute, the jury found in the alternative (and may in fact have been unable to tell whether the killer tortured the victim before death or mutilated her body immediately after her death) cannot be used now by O'Guinn to escape the death penalty. Obviously, the grotesque and deviant acts committed upon the victim before death or immediately afterward, or both, exhibit "depravity of mind." Furthermore, as the Tennessee Supreme Court noted, torture always involves depravity of mind. *Williams,* 690 S.W.2d at 529. Thus, the failure of the court to instruct the jury regarding the definition of these terms would, at most, be harmless error.[29]

As the Supreme Court has conclusively held, "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). The harmless error rule " 'promotes public respect for the criminal process by focusing on

---

system' modifies only 'reweighing'—just as 'constitutional' modifies only 'harmless-error analysis.' " *Smith,* 14 F.3d at 978 (citing *Stringer,* 503 U.S. at 237, 112 S.Ct. at 1140).

**28.** Whether such analysis is required if the state court in fact weighed and did so correctly, is not, in my judgment clear.

**29.** Even after removing any "depravity of mind" circumstance unrelated to the torture, the acts of torture easily outweigh the sole mitigating circumstance of O'Guinn's poor relationship with his father as exemplified by his father's affair with O'Guinn's former wife. The jury gave no weight to this mitigating circumstance.

the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986) (citations omitted). In this case, I would find beyond a reasonable doubt that the failure to instruct the jury regarding the meaning of the legal terms in the "heinous, atrocious, or cruel" aggravating circumstance did not contribute to the jury's imposition of the death penalty.

## CONCLUSION

I am persuaded that this court can and should decide O'Guinn's *Brady* claim. When the evidence that is the subject of that claim is considered, along with the entire records of the proceedings in the Tennessee courts and the federal district court, I think it is apparent that none of O'Guinn's claims of constitutional error has merit. It is not the prerogative of the federal habeas court to disregard the factual findings of the state courts except on the basis of one or more of the explicit grounds for doings so set out in 28 U.S.C. § 2254(d). None of those grounds is present here. Accordingly, I think that the proper disposition of this case is to reverse the district court's conditional grant of the writ, and to deny the petition in its entirety.

## APPENDIX A